# Westminster-Canterbury of Hampton Roads, Inc.

## v.

## City of Virginia Beach

Record No. 880524

November 10, 1989

Present: Carrico, C.J., Compton, Stephenson, Russell, Thomas,* Whiting, and Lacy, JJ.

---

* Justice Thomas participated in the hearing and decision of this case prior to the effective date of his resignation, November 1, 1989.

494

*James C. Howell (Willcox & Savage*, on briefs), for appellant.
*Gary L. Fentress*, Senior Assistant City Attorney *(J. Dale Bimson*, City Attorney, on brief), for appellee.

Chief Justice Carrico delivered the opinion of the Court.

Westminster-Canterbury of Hampton Roads, Inc. (Westminster) is a nonstock, nonprofit corporation which, according to its articles of incorporation, was "organized at the direction of the Commission on Services to the Aging, Episcopal Diocese of Southern Virginia[,] and Tidewater Westminster Homes, Incorporated, of the Norfolk Presbytery of the Presbyterian Church of the United States." Westminster owns and operates a housing and health-care facility for the elderly in the City of Virginia Beach.

For several years after construction of the facility, Westminster enjoyed a tax-exempt status on its real property. Then, in March 1984, the City assessed Westminster with taxes of approximately $400,000 for the year 1984 and the preceding two years. Westminster paid the assessment, and subsequently accruing taxes, under protest.

On January 31, 1986, Westminster filed an Amended Petition for Relief from Erroneous Assessment, challenging the City's revocation of its tax-exempt status. After a hearing, the trial court ruled in a final decree entered February 3, 1988, that Westminster did not qualify for tax exemption.

The court ruled further, however, that the City was estopped from retroactively assessing Westminster's real property because it had constructed the facility on assurances from city officials that the property would be exempt from taxation. Accordingly, the court ordered the City to refund $298,279.97 to Westminster for the years 1982 and 1983.

On appeal, Westminster's principal assignments of error attack the trial court's ruling that Westminster did not qualify for tax exemption and the court's holding that the City was not estopped from collecting taxes for the year 1984 and future years. By an assignment of cross-error, the City challenges the court's ruling

that the City was estopped from collecting taxes for the years 1982 and 1983.

Dated October 22, 1976, Westminster's articles of incorporation state that "[t]he Corporation is organized exclusively for charitable, religious, educational, and scientific purposes, including, for such purposes[,] the establishment of a home for the elderly." The articles also provide that "[n]o part of the net earnings of the Corporation shall inure to the benefit of, or be distributed to, its members, directors, officers, or other private persons."

Located on Chesapeake Bay, the facility consists of a 14-story residence wing containing 339 apartments, 56 of which are specially designed for handicapped persons. There is also a three-story health-care wing where nursing-home care is provided. The wing contains a resident clinic, a diagnostic service, and a physical therapy room. Staff consists of a full-time nurse practitioner and three physicians from Eastern Virginia Medical Authority who are specialists in geriatrics. Medical services are available on a full-time basis. Community residents-at-large may use the health-care facilities.

The facility offers housing and nursing care to persons 65 years of age or older, except in limited situations, for example, where a spouse of a resident is under 65. A resident of the facility pays an initial founder's fee and monthly charges. Founder's fees run from $54,900 for a studio apartment to as much as $146,500 for a two-bedroom unit. Monthly charges range from $668.88 to $1,247.32 for single-person occupancy and from $1,058.27 to $1,565.32 for double occupancy. Payment of the founder's fee and the monthly charges entitles a resident to housing and nursing-home care for life. A resident holds a non-transferable life estate in the facility.

Residents are provided carpeted rooms, venetian blinds, a stove, a refrigerator, one meal per day, and weekly linen service. Organized activities, transportation, security, telephone, and emergency systems are also provided.

Applicants must submit to a physical examination and be capable of "living independently," although applicants need not be in good health. Residents must maintain health insurance. If a resident requires hospitalization, he or she must continue to pay the regular monthly charges. In the event a resident moves permanently to the nursing-care unit, his or her apartment is assigned to a new resident with payment of a new founder's fee.

Westminster maintains a fellowship fund, designed to assist those residents unable to pay the founder's fee and monthly charges. However, no resident has been allowed a reduction in the founder's fee for "a number of years" and no resident has ever been relieved fully from payment of the founder's fee and monthly charges. At time of trial, 13 of the 393 residents were receiving assistance from the fund in part payment of their monthly charges. Payments made from the fund are considered loans to be repaid if the recipient's financial situation improves, although no repayment has yet been made.

The facility does not require that residents practice any religious faith. There is, however, a strong emphasis on religion, and 60% of the residents profess to belong to the sponsoring churches. A small private chapel and a larger room which doubles as a chapel are available for use by all denominations, and services are held on Thursdays and Sundays.

While the facility is designed to serve the needs of the middle-income elderly, an applicant is not denied admission because of his or her wealth. The median net worth of all residents is $110,000, after payment of the founder's fee. Five residents are millionaires, including one with a net worth in excess of $12 million. About twenty residents have virtually no assets.

The facility at Virginia Beach is identical in all material respects to four other Westminster-Canterbury facilities in Virginia, those in Richmond, Lynchburg, Winchester, and Irvington. The Richmond, Lynchburg, and Winchester facilities enjoy tax-exempt status by specific designation of the General Assembly. The Irvington facility does not enjoy tax-exempt status.

At the time the Virginia Beach facility lost its tax-exempt status, three other Virginia Beach housing facilities for the elderly with religious affiliations also lost their tax-exempt status. However, with the endorsement of the city council of Virginia Beach, the other facilities regained their tax-exempt status by specific designation of the General Assembly. Although Westminster has requested the City to endorse its effort to secure tax exemption by General Assembly designation, the City has refused, and Westminster has not attempted to secure exemption by designation.

The source authority for tax exemption in Virginia is Article X, Section 6 of our Constitution. In pertinent part, the section reads:

§ 6. **Exempt property.** — (a) Except as otherwise provided in this Constitution, the following property and no other shall be exempt from taxation, State and local, including inheritance taxes:

. . . .

(6) Property used by its owner for religious, charitable, patriotic, historical, benevolent, cultural, or public park and playground purposes, as may be provided by classification or designation by a three-fourths vote of the members elected to each house of the General Assembly and subject to such restrictions and conditions as may be prescribed.

. . . .

(f) Exemptions of property from taxation as established or authorized hereby shall be strictly construed . . . .

Pursuant to the constitutional authority to exempt property by classification, the General Assembly has enacted several pertinent statutes. The first is Code § 58.1-3606, which exempts in paragraph (A)(5):

Property belonging to and actually and exclusively occupied and used by the Young Men's Christian Associations and similar religious associations, including religious mission boards and associations, orphan or other asylums, reformatories, hospitals and nunneries, conducted not for profit but exclusively as charities (which shall include hospitals operated by nonstock corporations not organized or conducted for profit but which may charge persons able to pay in whole or in part for their care and treatment).

The General Assembly has also exempted property by classification in Code § 58.1-3609 which, at the time of trial, provided as follows:

A. The real and personal property of an organization classified in §§ 58.1-3610 to 58.1-3620 and used by such organization for a religious, charitable, patriotic, historical, benevolent, cultural, or public park and playground purpose as set forth in Article X, § 6 [(a)(6)] of the Constitution of Virginia, the particular purpose for which such organization is classified being specifically set forth within each section, shall

be exempt from taxation, so long as such organization is operated not for profit and the property so exempt is used in accordance with the purpose for which the organization is classified.

B. Exemptions of property from taxation under this article shall be strictly construed in accordance with Article X, § 6(f) of the Constitution of Virginia.

Code § 58.1-3617, referred to in Code § 58.1-3609, reads as follows:

Any church, religious association or religious denomination operated exclusively on a nonprofit basis for charitable, religious or educational purposes is hereby classified as a religious and charitable organization. Notwithstanding § 58.1-3609, only property of such association or denomination used exclusively for charitable, religious or educational purposes shall be so exempt from taxation.

Pursuant to the constitutional authority to exempt property from taxation by designation, the General Assembly has granted hundreds of exemptions by specifically naming the organizations owning the property. Code §§ 58.1-3607, -3650, -3650.1 through -3650.172, and -3650.173 through -3650.356. For example, the Westminster-Canterbury facility in Richmond was exempted by Code § 58.1-3650.29 (Acts 1975, c. 376), the Westminster-Canterbury facility in Lynchburg by Code § 58.1-3650.73 (Acts 1978, c. 228), and the Westminster-Canterbury facility in Winchester by Code § 58.1-3650.220 (Acts 1986, c. 619).

## CLASSIFICATION vs. DESIGNATION

Much of the debate between the parties involves the question whether Westminster may rely upon the classification statutes to gain tax-exempt status or whether it must rely solely upon the designation statutes. The arguments advanced on this question focus upon the effect of the General Assembly's action in granting tax-exempt status to the Westminster-Canterbury facilities in Richmond, Lynchburg, and Winchester.

Westminster argues that it is entitled to tax-exempt status under Code §§ 58.1-3609 and -3617, both classification statutes, because it is a nonprofit religious association whose property is

used exclusively for charitable purposes. Westminster also argues that it is entitled to tax-exempt status under Code § 58.1-3606 (A)(5), another classification statute, because it is a religious association similar to the Young Men's Christian Association.

Westminster says that to qualify for tax exemption under Code §§ 58.1-3609 and -3617, it must establish it is a nonprofit, religious association whose property is used exclusively for charitable purposes and that to qualify under Code § 58.1-3606(A)(5), it must also establish it is a religious association similar to the Young Men's Christian Association. Westminster submits that its not-for-profit status has never been disputed, leaving only the question whether it has shown that its property is used "exclusively on a charitable basis by a religious association . . . or a religious association similar to the YMCA."

Westminster points out that the General Assembly, in designating the Westminster-Canterbury facilities in Richmond, Lynchburg, and Winchester as tax-exempt, used such phrases as "benevolent and religious organization" and "charitable and benevolent organization" within "the context of Section 6(a)(6) of Article X of the Constitution of Virginia." From this usage, Westminster argues that if those facilities, admittedly identical in all material respects with the facility at Virginia Beach, "come within the definitional ambit of 'charitable,' 'benevolent' and 'religious' within the context of Section 6(a)(6) of Article X of the Constitution of Virginia," then the facility in Virginia Beach "must accordingly be 'charitable,' 'benevolent' and 'religious' within the meaning of that Article, and hence must be 'charitable' and 'religious' within the purview of Virginia Code Sections 58.1-3606A.5, 58.1-3609 and 58.1-3617."

Westminster adds that "the conclusion is inescapable that either Westminster is 'charitable' and 'religious' within the parameters of the statutes upon which it relies or . . . the Virginia General Assembly has, on three separate occasions . . ., exempted the other facilities through unconstitutional enactments." And, Westminster concludes, "[a]ll doubts about the constitutional validity of a statute are to be resolved in favor of its validity." .

■ We disagree with Westminster's interpretation that the General Assembly's action with respect to the three other Westminster-Canterbury facilities establishes the "charitable," "benevolent," and "religious" nature of the Virginia Beach facility. While that interpretation might arguably be reasonable, if there is

another reasonable interpretation of the General Assembly's prior action, then Westminster's interpretation must lose.

█ This follows because under our present Constitution, which became effective July 1, 1971, the rule in Virginia is that "[e]xemption of property from taxation . . . shall be strictly construed." Art. X, § 6(f). And, under this rule, "[e]xemption from taxation is the exception, and where there is any doubt, the doubt is resolved against the one claiming exemption." *Golden Skillet Corp.* v. *Commonwealth*, 214 Va. 276, 278, 199 S.E.2d 511, 513 (1973).

█ Westminster came into existence and acquired its property after July 1, 1971. Hence, its claim to exemption must be strictly construed. This means that Westminster's entitlement to exemption must appear clearly from the statutory provisions upon which it relies.

█ As noted previously, Westminster relies upon Code §§ 58.1-3606(A)(5) and 58.1-3617. Under § 58.1-3606(A)(5), however, only property belonging to organizations conducted *exclusively as charities* may be exempted from taxation, and under § 58.1-3617, only property used *exclusively for charitable purposes* may be exempted.

█ We do not think it appears clearly that Westminster is an organization conducted exclusively as a charity or that its property is used exclusively for charitable purposes. Hence, it is at least doubtful that Westminster is entitled to exemption under the classification statutes.

█ It does not follow, however, that the General Assembly's action with respect to the three other Westminster-Canterbury facilities, which are admittedly identical to the Virginia Beach facility, is of doubtful validity. The General Assembly does not labor under the stricture imposed upon tax authorities by the classification statutes. The language "exclusively as charities" and "exclusively for charitable purposes," found in the classification statutes, does not appear in Article X of the Constitution, the source of the General Assembly's authority to exempt property from taxation by designation, and no statute imposes such a restriction upon the General Assembly.

█ In our view, the General Assembly deliberately created this classification-designation dichotomy in the field of tax exemption, reserving unto itself the authority to grant exemptions where entitlement under the stricter terms of the classification statutes

might be doubtful. This dichotomy is the source of the other reasonable interpretation we make of the General Assembly's prior action with respect to housing organizations having Westminster's specific characteristics. We interpret the consistent manner in which the General Assembly has dealt with such organizations to mean that they must obtain exemption via the designation route.

■ This is not to say that every organization providing housing for the elderly must obtain exemption by designation. Those clearly qualifying under the classification statutes are entitled, of course, to exemption at the hands of tax authorities. But, because Westminster does not clearly qualify under those statutes, we reject its claim for exemption by classification.[1]

### ESTOPPEL

Westminster contends that "the City is estopped through its prior assurances of Westminster's tax-exempt status from assessing retroactive *and prospective taxes*." (Emphasis in original.) Westminster says that the trial court found that Westminster had established the elements of estoppel by "clear, precise and unequivocal" evidence, yet limited the application of the estoppel theory to the retroactive assessments for the years 1982 and 1983.

Westminster emphasizes that, before deciding to locate its facility in Virginia Beach, the mayor and the city manager "specifically represented to Westminster that its property would be tax-exempt." These representations, Westminster states, "invited reliance . . . and change of position of the most extreme sort by Westminster." Hence, Westminster concludes, the trial court erred in refusing to apply the doctrine of estoppel to taxes for the year 1984[2] and future years.

---

[1] Westminster makes the additional argument that the revocation of its tax-exempt status was improper because the City did not apply objective standards in making its determination to revoke. In view, however, of our ruling *supra* that specific designation-by-name is required for exemption of the type of housing organization involved in this case, the point is moot. If Westminster was not entitled to exemption-by-classification in the first place, it cannot complain that the City failed to use objective standards in revoking the exemption.

[2] Westminster also argues that the assessment of taxes for the year 1984 was improper because made in March 1984, rather than as of the first day of the fiscal year, which, Westminster says, was July 1, 1983. Code § 58.1-3903, however, entitled "Omitted local taxes or levies," directs that if "any local tax has not been assessed for any tax year of the three years last past, . . . the . . . assessing officer shall list and assess the same with taxes at the rate or rates prescribed for that year." Clearly applicable here, this section imposes no limitation upon the time of the year an assessment for omitted taxes may be made.

██ We reject Westminster's conclusion. We have repeatedly held that estoppel does not apply to the state or to local governments when acting in a governmental capacity. *Gwinn* v. *Alward*, 235 Va. 616, 621, 369 S.E.2d 410, 413 (1988); *Board of Supervisors* v. *Booher*, 232 Va. 478, 481, 352 S.E.2d 319, 321 (1987); *McMahon* v. *City of Virginia Beach*, 221 Va. 102, 108, 267 S.E.2d 130, 134 (1980); *Segaloff* v. *City of Newport News*, 209 Va. 259, 261, 163 S.E.2d 135, 137 (1968); *Main* v. *Department of Highways*, 206 Va. 143, 150, 142 S.E.2d 524, 529 (1965).

While these decisions do not involve taxation, the principle they elucidate applies with equal force to the function of assessing and collecting taxes. This function clearly is governmental in nature, and it may not be thwarted by application of the doctrine of estoppel.

Even where a municipality has contracted formally to exempt property from taxation, it is not estopped from making a later assessment if the property is not "within any exempted class." *Bristol* v. *Dominion Nat. Bank*, 153 Va. 71, 76, 81, 149 S.E. 632, 634, 635 (1929). There, we said that "[w]hen the contract is once declared *ultra vires*, the fact that it is executed does not validate it, nor can it be ratified so as to make it the basis of suit or action, *nor does the doctrine of estoppel apply*." *Id*. at 81, 149 S.E. at 635 (emphasis added).

██ Accordingly, we hold that the trial court did not err in refusing to estop the City from collecting taxes for the year 1984 and future years. Indeed, considering the City's assignment of cross-error, we hold that the trial court should not have applied the doctrine of estoppel against the City at all. It follows that the court erred in ordering the City to refund $298,279.97 paid by Westminster for the years 1982 and 1983.

For the reasons assigned, the judgment of the trial court will be reversed to the extent that it ordered the City to make the $298,279.97 refund to Westminster, and final judgment will be entered here in favor of the City with respect to that aspect of the judgment. In all other respects, the judgment will be affirmed.

*Affirmed in part,*
*Reversed in part,*
*and final judgment.*

Justice Russell, with whom Justice Stephenson joins, dissenting.

The majority opinion discerns a "classification-designation dichotomy in the field of tax exemption" whereby Westminster-Canterbury may qualify for tax exemption by the designation route, but does not qualify by the classification route. In the context of this case, I perceive no dichotomy.

In my view, the legislature has, in strict compliance with the Constitution of Virginia, Article X, Section 6, provided two alternative routes to tax exemption: (1) classification by law and (2) designation by a three-fourths vote of the members of each house of the General Assembly. The Constitution contains no requirement that either route be exclusive, and the General Assembly has not so provided. Therefore, provided the applicant qualifies for a tax exemption at all, the availability of one route does not exclude the other. On the facts of this case, both routes are available to an entity which fits within their terms.

The framers of the Constitution, I believe, provided the designation route as an alternative to classification for two reasons: (1) it is simple, rapid, and final; it avoids the hazards, expense, and delay of litigation where there is any likelihood of dispute, and (2) it gives the General Assembly the express constitutional authority to prescribe such tailor-made "restrictions and conditions" as may be thought advisable for each case. For the foregoing reasons, I respectfully disagree with the majority's conclusion that while the designation door remains open to Westminster-Canterbury, the classification door is closed.

If, as I believe, both doors remain open, it is pertinent to determine whether Westminster-Canterbury is designed in a form that will pass through. The Constitution provides that property used by its owner for "charitable" or "benevolent" purposes "shall be exempt from taxation," but only "as may be provided by classification or legislation . . . ." Va. Const. Art. X, § 6(a)(6). The General Assembly has carefully followed that language in framing the three classification statutes quoted in the majority opinion. In my view, Westminster-Canterbury fits within each of the three.

Code § 58.1-3606 applies if the entity seeking tax exemption is a "religious association" or "asylum" and is "conducted not for profit but exclusively as [a] charit[y]." Westminster-Canterbury is, in effect, a joint effort by the Episcopal and Presbyterian churches to provide housing and nursing care for the aged. That it is a "religious association" is not seriously contested. "Asylum" is defined as "a place of refuge and protection . . . a place of retreat

and security: shelter . . . an institution for the protection or relief of some class of destitute, *afflicted, or otherwise unfortunate persons*." Webster's Third New International Dictionary 136 (1976) (emphasis added). "Charity" is defined as "a gift (as by grant or devise) of real or personal property to the use of the public *or any portion of it* as distinct from specific individuals *for any beneficial or salutary purpose*." *Id*. 378 (emphasis added). Neither the framers of the Constitution nor the drafters of the classification statutes chose language designed to restrict tax exemptions to organizations devoted exclusively to the care of the destitute, although they might easily have done so. Finally, it is conceded that Westminster-Canterbury is "conducted not for profit." Code § 58.1-3606, therefore, clearly applies.

Code § 58.1-3609 applies if the entity seeking tax exemption is a "religious association" (incorporating § 58.1-3617 by reference) and if its property is used for a "charitable" or "benevolent" purpose, so long as the organization is operated "not for profit." As we have seen, Westminster-Canterbury meets each of those tests.

Finally, Code § 58.1-3617 applies if the entity seeking tax exemption is a "religious association," which is "operated exclusively on a nonprofit basis," and devoted to "charitable" purposes. The classification applies only to property of such an entity which is used exclusively for "charitable . . . purposes." As we have seen, Westminster-Canterbury meets each of those tests as well.

Therefore, I conclude that Westminster-Canterbury meets the criteria of both the classification statutes and those of the Constitution, in order to qualify for tax-exempt status. Accordingly, I would reverse that part of the decree which denies tax exemption and affirm that part which ordered a refund of taxes paid under protest.