PRESENT: Carrico, C.J., Lacy, Hassell, Keenan, Koontz,and Kinser, JJ.

CITY OF RICHMOND

OPINION BY
v. Record No. 980498     JUSTICE LAWRENCE L. KOONTZ, JR.
                         January 8, 1999
VIRGINIA UNITED METHODIST HOMES, INC.

FROM THE CIRCUIT COURT OF THE CITY OF RICHMOND
Melvin R. Hughes, Jr., Judge


In this appeal, we consider whether the trial court erred in ruling that certain properties were exempt from the assessment of local real estate taxes because of their status as charitable "asylums."

**BACKGROUND**

Virginia United Methodist Homes, Inc. is a Virginia non-stock, non-profit corporation operating continuing care facilities for adults throughout the Commonwealth.[1] Among these facilities are The Hermitage in Richmond and Snyder Memorial Home (collectively, the properties), both of which are located within the City of Richmond.[2] Methodist Homes was chartered in 1945 and acquired the properties in 1948. In 1976, the Via

---

[1]The corporation was originally incorporated in the name of Virginia Methodist Home for the Aged, Inc. In this opinion we will refer to the continuing corporation and its predecessor entity as Methodist Homes.

[2]Subsequent to the time relevant to this appeal, Methodist Homes sold the Snyder Memorial Home property.

Health Care Center, a 115-bed nursing home facility, was added to The Hermitage in Richmond.  The properties presently provide three levels of care: independent living, assisted living, and health care.  Depending on the needs of an individual resident, these levels of care are available under continuing care contracts for the life of the resident or under monthly and daily leases.

The 1945 articles of incorporation of Methodist Homes called for the establishment of "a home or homes for the aged and infirm and needy persons."  As a matter of policy, admission was limited initially to persons age 65 and older.  Individual contracts of admission were negotiated with each prospective resident based upon the estimated cost of lifetime care and the individual's available income and assets to pay that cost, generally in monthly installments.  However, the ability of the resident to pay the full cost of care from personal income and assets was not a requisite factor in determining admission.  Once admitted, no resident was expelled because of the inability to continue to pay the agreed upon installments.

Over time, greater emphasis was placed on the ability of a prospective resident "to pay for their cost of care over their actuary life expectancy."  In 1961, the articles of incorporation were amended to reflect that the purpose of the corporation was to provide "a home or homes for aging persons."

As a result of this change in emphasis in the admission policy and corporate purpose, Methodist Homes began requiring that prior to admission there be an identified source of funds from "the individual, the government, family, church, [or] somebody" adequate to pay for the expected cost of lifetime care.

In the 1980s, Methodist Homes established the "Samaritan fund," a charitable account designed to provide "benevolent care" by funding the shortfall in future anticipated cost of care of prospective residents who lack sufficient income and assets to pay that cost at the time of admission. Currently Methodist Homes is "trying to develop the process where [it] can fund benevolent care" on a regular basis. However, funds available for benevolent care are limited and are first applied to the needs of residents already living in the properties.

The majority of the current residents of the properties are parties to continuing care contracts that require them to pay an entrance fee and monthly fees thereafter. Under the fee schedule pertinent to such contracts, the entrance fees range from $24,750 to $175,500 depending on the type of accommodation acquired and the present and prospective health care needs of the resident. Similarly, the monthly fees range from $1,074 to $2,979. Continuing care residents who become unable to pay their monthly fees are nevertheless entitled to residence and care for life. At the time relevant to this appeal, 29

3

continuing care residents were receiving this contract benefit. The deficit of their monthly fees is made up from charitable sources available to Methodist Homes, including the Samaritan fund.

The remaining residents of the properties are monthly lessees in independent and assisted living units and daily lessees who require full nursing care. The monthly lease rates range from $665 to $2,279; daily rates range from $99 to $135. Daily and monthly residents who are unable to meet their lease obligations are not entitled to receive assistance from the Samaritan fund or other direct assistance from Methodist Homes and "are asked to relocate."

Medicare and Medicaid benefits are not accepted from any resident to fulfill obligations under a continuing care contract or lease. The properties are not operated for profit and have never operated at a profit. Although financial gifts are regularly received from the United Methodist Church, Methodist Homes is neither operated nor controlled by the Church.

Until 1996, the properties were listed on the tax assessment rolls of the City of Richmond as tax-exempt. In 1996, and again in 1997, the City assessor determined that the properties were not eligible for tax-exempt status and assessed real estate taxes against them. Thereafter, Methodist Homes filed an application pursuant to Code § 58.1-3984 for relief

4

from those tax assessments and to have the resulting taxes, previously paid, refunded.[3] The City resisted the application. The City admitted that "it was incorrectly noted in the City Assessor's records that the [p]roperties were asylums and therefore they were accorded non-tax status" and for that reason no taxes had been assessed on the properties prior to 1996. However, the City maintained that the properties had never been entitled to have tax-exempt status, thus the 1996 and 1997 assessments were proper.

Prior to trial, the City filed a motion to restrict the evidence of Methodist Homes to proof of the allegation in the application that the properties are entitled to tax exemption as "asylums" under the provisions of Code § 58.1-3606(A)(5). The trial court sustained this motion.

At trial, Methodist Homes acknowledged that under the express provisions of Code § 58.1-3984 it had the burden to show that the 1996 and 1997 assessments are "illegal." Toward that end, Methodist Homes maintained that the previously related facts established that the properties were originally exempt

_____

[3]Methodist Homes filed its original application on July 26, 1996 challenging the 1996 tax assessment. On October 17, 1997, it filed an amended application to include a challenge to the 1997 tax assessment. Although in both instances Methodist Homes styled its application as a "motion for judgment," specific reference was made to Code § 58.1-3984 which provides the right to challenge the assessments.

from local taxation because the properties were conducted exclusively as charities and constituted "asylums" under the classification exemption provided in Section 183(e) of the 1902 Constitution of Virginia. Continuing, Methodist Homes maintained that the properties remain tax-exempt under Code § 58.1-3606(A)(5), which provides for the same exemption from local taxation for "asylums" as did Section 183(e) of the 1902 Constitution. This is so, Methodist Homes asserted, because the "grandfather clause" of Article X, Section 6(f) of the 1971 Constitution, and its codification in Code § 58.1-3606(B), requires the application of the rule of liberal construction to the exemption for "asylums," as that exemption is provided in Code § 58.1-3606(A)(5), for entities in existence in 1971, rather than the rule of strict construction, as is required under Article X, Section 6(f) for tax exemptions generally.

The City essentially took the opposite position and maintained that, under either rule of construction, the properties never operated as asylums as contemplated by the relevant statutory and constitutional provisions. In the alternative, the City asserted that even if the properties had been entitled to tax-exempt status in the past, the subsequent changes in Methodist Homes' corporate purpose and its admission policies had removed them from tax-exempt status. Finally, the City maintained that even if a liberal construction of Code

6

§ 58.1-3606(A)(5) is appropriate with regard to a portion of the properties, a strict construction was nonetheless required with regard to the Via Health Care Center wing of The Hermitage in Richmond, because that facility had not been constructed until 1976.

In its final order, the trial court expressly found that since their inception the properties had been "used exclusively as charities [and] as asylums under the law then applicable" and, thus, it was required by Code § 58.1-3606(B) to apply a liberal construction to the exemption by classification provisions of Code § 58.1-3606(A)(5).  Applying that standard, the trial court further found that for the tax years in question the properties "were used as asylums for nonprofit purposes exclusively as charities and thus . . . the assessments of the two aforementioned properties for the year[s] 1996 and 1997 [are] erroneous."  The trial court ordered the City to refund the taxes already paid, together with costs and interest.  We awarded the City this appeal.

### DISCUSSION

On appeal, as was the case at trial, one of the principal disputes between the parties is whether the provisions of Code § 58.1-3606(A)(5) are to be construed with reference to the properties in question by applying a strict or liberal construction rule.  The distinction between these rules of

7

construction is found in Commonwealth v. Lynchburg Y.M.C.A., 115 Va. 745, 80 S.E 589 (1914). There, with reference to the 1902 Constitution, we stated:

> The general rule is that provisions exempting property of individuals or private corporations from taxation must be strictly construed, taxation of such property being the rule and exemption from taxation the exception. One of the reasons for this is that all such persons should bear their fair share of the burdens of taxation, and that lessening the burden of one increases the burdens of others. But as the policy of the State has always been to exempt property of the character mentioned and described in section 183 of the Constitution, it should not be construed with the same degree of strictness that applies to provisions making exemptions contrary to the policy of the State, since as to such property exemption is the rule and taxation the exception.

Id. at 747-48, 80 S.E. at 590.

Thus, it is apparent that the application of a liberal construction rule, that is, one in which exemption is the rule and taxation the exception, significantly facilitates Methodist Homes' assertion that the properties come within the exemption granted by Code § 58.1-3606(A)(5). Stated alternately, if the properties do not qualify for this exemption under the rule of liberal construction, they necessarily would not qualify under the rule of strict construction, that is, where taxation is the rule and exemption the exception, because under that rule, "where there is any doubt, the doubt is resolved against the one

8

claiming exemption." Golden Skillet Corp. v. Commonwealth, 214 Va. 276, 278, 199 S.E.2d 511, 513 (1973).

This is the fourth instance in which we have been called on to review an organization's claim of tax-exempt status by classification under Code § 58.1-3606. See Mariner's Museum v. City of Newport News, 255 Va. 40, 495 S.E.2d 251 (1998); Children, Inc. v. City of Richmond, 251 Va. 62, 466 S.E.2d 99 (1996); Westminster-Canterbury of Hampton Roads, Inc. v. City of Virginia Beach, 238 Va. 493, 385 S.E.2d 561 (1989). Although in each of these prior cases we focused primarily on the charitable status of the owner's overall operations and the use of the property in question in furtherance of that charitable purpose, rather than the classification of the property itself, these cases, in large part, guide our resolution of the present appeal. In contrast, here we must first determine whether the trial court properly found that the properties are "asylums" within the classification for tax-exempt property provided in the applicable constitutional and statutory provisions before we reach the issue, if necessary, of whether they are operated exclusively as charities. Our resolution of the rule of construction to be applied in construing the exemption is critical to that determination.

Section 183(e) of the 1902 Constitution provided a tax exemption for

9

> [r]eal estate belonging to, actually and exclusively
> occupied and used by, and personal property, including
> endowment funds, belonging to young men's christian
> associations, and other similar religious
> associations, orphan or other asylums, reformatories,
> hospitals and nunneries, conducted not for profit, but
> exclusively as charities.

(Emphasis added.)

The 1971 Constitution eliminates this per se tax exemption, and instead provides in Article X, Section 6(a)(6) that "[p]roperty used by its owner for religious, charitable, patriotic, historical, benevolent, cultural, or public park and playground purposes," is subject to tax-exemption through "classification or designation by a three-fourths vote of the members elected to each house of the General Assembly and subject to such restrictions and conditions as may be prescribed."  Under this authority, the tax exemptions of Section 183 of the 1902 Constitution, including those of subsection (e), were codified in substantially the same form first in former Code § 58-12, and subsequently in Code § 58.1-3606.  Subsection (A)(5) of the latter statute, applicable at the time the assessments in question were made, provides tax exemptions to property belonging in one of the following classes:

> Property belonging to and actually and
> exclusively occupied and used by the Young Men's
> Christian Associations and similar religious
> associations, including religious mission boards and
> associations, orphan or other asylums, reformatories,

10

> hospitals and nunneries, conducted not for profit but
> exclusively as charities (which shall include
> hospitals operated by nonstock corporations not
> organized or conducted for profit but which may charge
> persons able to pay in whole or in part for their care
> and treatment).

(Emphasis added.)

Article X, Section 6(f) of the 1971 Constitution provides that "[e]xemptions of property from taxation as established or authorized hereby shall be strictly construed; provided, however, that all property exempt from taxation on the effective date of this section shall continue to be exempt until otherwise provided by the General Assembly." Thus, property that was entitled to tax-exempt status prior to July 1, 1971, the effective date of the 1971 Constitution, was "grandfathered" out of the requirement for strict construction until such time as the legislature acted to affirm or remove that status.

As we discussed in Children, Inc., supra, under both the 1902 Constitution and the grandfather clause of the 1971 Constitution, the tax exemptions of Code § 58.1-3606 were liberally construed, whereas, following 1985 amendments to Code § 58.1-3606(A), new property exemptions were created by the General Assembly that no longer required the organization seeking the exemption to have been in existence and to have acquired the property prior to July 1, 1971. Accordingly, we held that the General Assembly also thereby imposed a rule of

11

strict construction upon these new tax exemption classifications. Children, Inc., 251 Va. at 65-66, 466 S.E.2d at 101-02. Noting that these amendments had the potential to disrupt the tax exemption that many organizations had previously enjoyed under the 1902 Constitution and the grandfather clause of the 1971 Constitution, we went on to observe that

> The General Assembly addressed this potential problem by adding subsection B to Code § 58.1-3606. That subsection provides:

>> B. Property, belonging in one of the classes listed in subsection A of this section, which was exempt from taxation on July 1, 1971, shall continue to be exempt from taxation under the rules of statutory construction applicable to exempt property prior to such date.

> Thus, the rule allowing liberal construction of exemptions was preserved under certain circumstances. Those circumstances are plainly and unambiguously set out, avoiding the uncertainty generated by the word "property" in the grandfather clause. Property, as used in subsection B, belongs "to a class"; it does not mean "a class of property." Thus, the word property refers to a specific piece of real or personal property.

> Subsection B limits the use of liberal rules of construction to circumstances involving a specific piece of property that (i) belongs to one of the classes described in subsection A, and (ii) was exempt from taxation on July 1, 1971. Requiring a piece of property to be exempt on a specific date presumes that the property existed on that date. And, because tax exemptions do not run with property, see Code § 58.1-3601, an organization must have owned the piece of property on July 1, 1971, to qualify for a tax exemption under the liberal construction allowed by subsection B.

12

Children, Incorporated, 251 Va. at 67, 466 S.E.2d at 102 (footnote omitted).

Turning now to the circumstances of the present case, we think it is clear both that the properties were in existence and were owned by Methodist Homes prior to July 1, 1971.[4] Accordingly, we will initially apply a liberal construction to the exemption in question to determine whether the properties were "asylums" on or before that date.

We have not previously defined the term "asylums" as used in Section 183(e) of the 1902 Constitution or Code § 58.1-3606 and its predecessor statute. However, drawing on common definitions from the time of ratification of the 1902 Constitution, the dissent in Westminster-Canterbury defined an "'Asylum' . . . as 'a place of refuge and protection . . . a place of retreat and security: shelter . . . an institution for the protection or relief of some class of destitute, afflicted, or otherwise unfortunate persons.'" Westminster-Canterbury, 238 Va. at 504-05, 385 S.E.2d at 568 (Russell, J., dissenting)

_____

[4]The City did not apportion its assessment so as to assess the Via Health Care Center separately, and Methodist Homes maintains that the Center is an integral part of The Hermitage in Richmond. Neither party presented evidence at trial that would have required or permitted the trial court to consider the tax-exempt status of the Center independently. Therefore, any issue of apportionment is not properly presented in this appeal. Cf. City of Richmond v. United Givers Fund, 205 Va. 432, 439, 137 S.E.2d 876, 881 (1964); see also Code § 58.1-3603.

(quoting Webster's Third New International Dictionary)(emphasis omitted).  While we need not, and do not, adopt this as a comprehensive definition of this term for all purposes, we are satisfied that it is a commonly accepted definition and adequate for the resolution of this appeal.  This is particularly so in the absence of any alternate definition offered by Methodist Homes and when this definition is applied in the context of a tax exemption that is given the benefit of a liberal construction.

The original purpose of the properties as defined by the 1945 articles of incorporation was to provide "a home or homes for the aged and infirm and needy persons."  In the context that tax exemption is the rule and taxation the exception, we discern no material distinction between such use of the properties and the use of property for the protection or relief of some class of destitute, afflicted, or otherwise unfortunate persons under the above definition of asylum.  Accordingly, we are satisfied that the properties were exempt from taxation for many years after they were acquired by Methodist Homes in 1948 because during that time they came within the definitional classification of "asylums" in Section 183(e) of the 1902 Constitution.

However, the 1961 amendment of the articles of incorporation deleted the reference to "the aged and infirm and

14

needy persons," and replaced it with the term "aging persons."

This was a significant change in the purpose for which the

properties would be used and requires that we determine whether

as a result the properties continued to qualify for the

exemption for asylums even under a liberal construction of that

exemption. Cf. Mariner's Museum, 255 Va. at 45, 495 S.E.2d at

253-54 (change in use of property may render otherwise exempt

property taxable). We conclude that they did not.

The term "aging persons" does not necessarily include

disabled or afflicted persons; nor is there any indication in

the amended articles of incorporation that assisting those in

financial need would continue to be a relevant consideration of

the corporate purpose. Indeed, the current requirement that

prospective residents have sufficient financial means from

sources independent of Methodist Homes to meet the cost of care

prior to admission and that daily and monthly lessees unable to

meet their obligations are required to relocate refutes any

notion that the properties are used to serve destitute or

otherwise unfortunate persons. It may be true that many

residents of the properties do suffer from disabilities and

afflictions or ultimately become indirect beneficiaries of the

charitable funds that may be applied to supplement a shortfall

in payment of life care contract fees. However, if the express

purpose of a given institution and the use of its property is to

15

provide residence and care merely for "aging persons" without special regard for whether they are also "destitute, afflicted, or otherwise unfortunate persons," that property cannot, even under a liberal construction, be termed an "asylum." Accordingly, we hold that the trial court erred in ruling that on July 1, 1971 the properties were used as "asylums" and, thus, were entitled to tax exemption at that time and to continued tax-exempt status under a liberal construction of Code § 58.1-3606.

Because the properties continued to be utilized as "homes for aging persons" during the time relevant to this appeal, it is self-evident that they do not qualify as "asylums" under a strict construction of the exemption in question.  Since the properties do not belong to the class of properties defined in Code § 58.1-3606(A)(5) and, thus, do not qualify for that tax exemption, we need not reach the issue of whether they are operated exclusively as charities.[5]

For these reasons, we will reverse the judgment of the trial court and enter final judgment for the City.

<u>Reversed and final judgment</u>.

---

[5]Nothing in this opinion should be interpreted as restricting Methodist Homes from obtaining a legislative exemption from local taxes by designation under Code § 58.1-3607.

16