# Richmond

## The Weber City Sanitation Commission v. R. G. Craft.

April 25, 1955.

Record No. 4342.

Present, All the Justices.

The opinion states the case.

*Coleman & Coleman*, for the appellant.

*Quillen & Carter* and *E. Hagan Richmond*, for the appellee.

WHITTLE, J., delivered the opinion of the court.

The Weber City Sanitation Commission, hereinafter called Commission, filed its bill in the Circuit Court of Scott County against R. G. Craft, hereinafter called Craft, praying that a mandatory injunction be issued requiring Craft to connect with the water works system operated by the Commission and to pay the minimum rates from the time the water service was made available.

Craft filed a demurrer and answer contending that section 6(13) of Chapter 523, Acts of Assembly, 1948, under which the Commission was established and operated, and the resolution of June 16, 1950, adopted by the Commission pursuant thereto, were unconstitutional because they contravened and were "repugnant to Amendment 5 of the Constitution of the United States, Amendment 14, section 1 of the Constitution of the United States, section 11 of the Constitution of * * * Virginia, and of section 170 of the Constitution * * * of Virginia."

The judge of the Circuit Court of Scott County disqualified himself and transferred the cause to the Corporation Court of the City of Bristol, where, by decree entered February 26, 1954, the demurrer was overruled. The decree further held that the court having heard the case on the bill, exhibits, answer and depositions and the record at large was "of the opinion that subsection 13 under section 6 of the Acts of the Assembly of 1948, under Chapter 523 thereof * * * is repugnant to and contravenes the Constitution of the Commonwealth of Virginia, and the Constitution of the United States; and * * * doth adjudge, order and decree that the said bill of complaint be, and the same hereby is dismissed * * *."

From this decision we granted the Commission an appeal.

██ Several assignments of error are relied upon by the Commission, but both the Commission and Craft agree that "the sole issue and question presented by the pleadings and evidence in this case is whether or not section 6(13) of Chapter 523 of the Acts of 1948 and the resolution of June 6, 1950, adopted pursuant thereto are unconstitutional or whether they constitute a valid exercise of the police power of the State."

This act, passed under authority of section 147 of the Constitution of Virginia, created the Weber City Sanitation District, of which the Commission was the governing body. The declared purposes of the act were "the prevention or reduction of the pollution of the waters of the State in the area hereinafter defined by the discharge of sewage and industrial waste therein, and the providing of an adequate water supply for the inhabitants therein * * * for the preservation of the health of the people of said area * * *."

The act provided that the Commission should function as a public instrumentality with the powers granted therein. It was authorized to own, operate and maintain waterworks, to acquire riparian rights and to erect and maintain necessary main and service lines for the distribution of water to con-

sumers, and to charge and collect water rents therefor as provided in section 6(7).

The Commission was empowered to issue bonds "to construct, erect, purchase, own, maintain and operate" the waterworks system, and the Circuit Court of Scott County, on August 4, 1948, entered an order requiring the regular election officials to open the polls and take the sense of the qualified voters of the district on the question of issuing said bonds for the purposes aforesaid. The election was held and the bond issue carried. On January 23, 1950, the court entered an order authorizing and empowering the Commission "to prepare, issue and to sell or negotiate bonds * * * in the amount of $300,000." The bonds were duly issued and sold and a water system constructed.

The Commission was also authorized and empowered to require abutting property owners to connect with any water system which might be owned or operated by it. (Section 6(13)) Pursuant to this section, "for the preservation of the health and welfare of the inhabitants of said district", the Commission, on June 16, 1950, adopted and enacted the resolution here challenged, requiring the abutting property owners "to connect with said waterworks for domestic uses and personal consumption of water upon such abutting premises and to abandon the use and consumption of any private subsurface water for such use and consumption" as and when water and water service were made available to the inhabitants within said district.

The bill alleged that it "was necessary in said district to safeguard the public health and general welfare of the inhabitants of said district by providing an adequate supply of potable water and eliminating the public hazards of contaminated wells, which could only be accomplished by requiring all abutting property owners within said district to connect with said waterworks system."

It was alleged that Craft, an abutting owner of several parcels of land within said district, refused to comply with the mandate of the resolution and refused to "connect with said

waterworks system and to pay for water and water service from the time that water and water service were made available", and that he continued to use water from his subsurface well for domestic uses and personal consumption.

Craft, in his answer challenging the constitutionality of the provisions of § 6(13) of the act, and the resolution of June 16, 1950, requiring him to connect with the system, asserted that before the Commission was established he had spent $2,500 in constructing a well on his property, which provided an adequate supply of water for his use. He further asserted that the enforcement of the provisions of the act and resolution would deprive him of his property without due process of law.

Depositions of witnesses for the Commission disclosed that the area embraced by the sanitation district is contiguous to the corporate limits of Gate City, within which area are located seven or eight hundred dwelling houses and fifty business establishments; that the town of Gate City has a population of two thousand or more inhabitants; that there are seven churches in the district; that the population of the district area is approximately 3,000; that there are over 400 school children living in the area who are transported to schools in Gate City where they mingle with approximately 1,000 other children from Gate City and surrounding territory; that a large part of the territory lies along U. S. Highway 23 between Gate City, Virginia, and Kingsport, Tennessee, along which there are practically no unoccupied lots for a distance of two miles to the Tennessee line, which condition prevails practically to Kingsport, a distance of six miles from the district boundary; that Kingsport is a city of 40,000 population; that between three and four hundred residents of the sanitation district are employed in Kingsport and commute daily; that there is no public sewerage system within the borders of the sanitation district, and the sewage from seven or eight hundred residences and fifty business establishments is disposed of by means of private septic tanks, cesspools and outdoor toilet facilities located on the same lots with the respective wells;

that a great number of the deep wells located on the various lots were contaminated and the water was unfit for human consumption and had. been condemned by the Virginia Department of Public Health; that the well on the premises of Craft had been condemned by the State Health Department during the construction period of the waterworks system although this well had been found uncontaminated and the water therein pure at the time of the taking of the depositions; that on the premises of Craft is located a dwelling house occupied by an employee, and also a service station operated by the tenant; that this service station does a large volume of business.

Depositions on behalf of Craft tended to show the facts alleged in his answer, that the water supply on his premises was adequate for his needs and that the water had been approved by the State Department of Health; that he had spent approximately $2,500 in constructing his private water system; that he did not need water service from the Commission and had never applied nor contracted for its use.

Craft challenged the Commission's assertion that section 6(13) and the resolution were enacted and adopted for the preservation of the general health and welfare of the inhabitants of the district, contending that the system was installed for the purpose of supplying adequate water to the inhabitants without any thought to the health and welfare of said inhabitants; that the Commission was set up by the act to supply water for convenience and that convenience alone was not sufficient to bring the section of the act or the resolution within the purview of the police power. He asserts that the resolution requiring abutting property owners to connect to the system was adopted without notice to the owners and without providing for a right of judicial review. He further asserts that an abutting property owner should not be required to pay for a service which "he does not want or need, * * * and for which he has not contracted, and wholly against his will."

If § 6(13) of the act and the resolution of June 16, 1950,

were validly enacted and adopted in furtherance of the general police power of the State then in that event these contentions are untenable.

"At the outset of this consideration it must be remembered that every presumption is made in favor of the constitutionality of an act of the legislature. A reasonable doubt as to the constitutionality of a law must be resolved in favor of its validity. The Constitution is not a grant of power, but only the restriction of powers otherwise practically unlimited and except so far as restrained by the Constitution of this State and the Constitution of the United States, the legislature has plenary power. It is only in a case where a statute is plainly repugnant to some provision of the Constitution that the courts can declare it null and void. The wisdom and propriety of the statute come within the province of the legislature." *City of Newport News* v. *Elizabeth City County*, 189 Va. 825, 831, 55 S. E. (2d) 56, 60.

"All acts of the legislature are presumed to be constitutional until the contrary be clearly shown. If through reasonable interpretation and construction it can be concluded that the act contravenes no provision of the Constitution, it is the duty of this court to pronounce it valid. If there be reasonable doubt whether it violates the fundamental law, that must be resolved in favor of the act. Only where it is plainly in violation of the Constitution may the court so decide." *Almond* v. *Gilmer*, 188 Va. 822, 834, 51 S. E. (2d) 272, 276.

Under our system the police power is vested in the General Assembly which may, through appropriate legislation, delegate the power to municipalities and other governmental subdivisions of the State.

In Virginia the establishment of sanitary districts is not new. Their creation is encouraged both by the general law (Code, 1950, Vol. 4, page 483, "Sanitation Districts Law of 1946"), and the Virginia Constitution (§ 147).

Clearly, the general law as well as section 6(13) of Chapter 523 of the Acts of the General Assembly of 1948, both sanctioned by the Constitution, and the resolution adopted

pursuant thereto, were enacted for the purpose of promoting the public convenience and general prosperity as well as the public health and safety of the people of the district. Both purposes are embraced within the State's police power.

As was said by Justice Harlan in *C. B. & Q. R. Co.* v. *Illinois*, 200 U. S. 561, 26 S. Ct. 341, 349, 50 L. ed. 596:

"We hold that the police power of a State embraces regulations designed to promote the public convenience or the general prosperity, as well as regulations designed to promote the public health, the public morals or the public safety."

So far as we know, the power of the State, under its police power, to provide for the health of its people, has never been questioned, but on the contrary, has been stressed as one of the powers which may be given the broadest application; and it is common knowledge that this power has been increasingly exercised, in keeping with advances made in the sciences of medicine and sanitation, in recent years. In these circumstances, courts are reluctant to place limits on what may be done in the interest of the health of a community, so long as unreasonable methods are not employed, nor the natural and constitutional rights of citizens invaded.

The evidence introduced by both parties shows that the subsurface wells here involved, including the well of Craft, are on lots where septic tanks, cesspools and outdoor toilets are maintained; that the water from many of these wells has at one time or another been contaminated and unfit for human consumption, and at one time this was the situation with respect to the well on Craft's property.

Thus § 6(13) of the act and the resolution of June 16, 1950, adopted pursuant thereto, were clearly designed to preserve and protect the public health of the inhabitants, and such legislation falls directly within the police power delegated by the State to the Commission and is therefore constitutional. Even in the absence of such convincing evidence it must be assumed that the legislature acted with wisdom and propriety in passing the legislation. Craft has in no way rebutted this presumption; nor has he shown an unconstitutional depriva-

tion of property. In the case of *Mugler* v. *Kansas*, 123 U. S. 623, 8 S. Ct. 273, 31 L. ed. 205, the court said:

"But this court has declared, upon full consideration, in *Barbier* v. *Connolly*, 113 U. S. 27, 31, that the Fourteenth Amendment had no such effect. After observing, among other things, that that Amendment forbade the arbitrary deprivation of life or liberty and the arbitrary spoliation of property, and secured equal protection to all under like circumstances, in respect as well to their personal and civil rights as to their acquisition and enjoyment of property, the court said: 'But neither the Amendment—broad and comprehensive as it is— *nor any other amendment*, was designed to interfere with the power of the State, sometimes termed its police power, to prescribe regulations to promote the health, peace, morals, education, and good order of the people, and to legislate so as to increase the industries of the State, develop its resources, and add to its wealth and prosperity.' " (Italics supplied)

A citizen holds his property subject to the proper exercise of the police power either by the General Assembly directly, or by municipal corporations or other State agencies to which such power has been delegated. Laws and ordinances relating to the comfort, health, good order and general welfare of the inhabitants of a community which can properly be styled police regulations, enacted pursuant to the police power inherent in the sovereign, may properly be equally enforced against all similarly situated though they may disturb the enjoyment of individual rights. Such laws do not appropriate private property for public use but simply regulate its use and enjoyment by the owners.

Therefore, under such circumstances, if one "suffers injury, it is either *damnum absque injuria*, or, in the theory of the law, he is compensated for it by sharing in the general benefits which the regulations are intended and calculated to secure. The citizen owns his property absolutely, it is true; it cannot be taken from him for any private use whatever without his consent; nor for any public use without compensation. Still he owns it subject to this restriction, namely,

that it must be so used as not to injure others, and that the sovereign authority may, by police regulations, so direct the use of it that it shall not prove pernicious to his neighbors, or the citizens generally. * * * This power to restrain a private injurious use of property is very different from the right of eminent domain. It is not a taking of private property for public use." 1 Dillon, Municipal Corporations, 3rd Ed., § 141; *Hopkins* v. *Richmond*, 117 Va. 692, 86 S. E. 139.

If Craft and other citizens similarly situated could not be required to connect with the water system provided for under the act its effectiveness would be nullified.

"The Virginia Constitution declares that the exercise of the police power of the State shall never be abridged. Section 159. The legislature may, in the exercise of the police power, restrict personal and property rights in the interest of public health, public safety, and for the promotion of the general welfare. * * * The extent of this power is difficult to define, but it is elastic, and expands automatically to protect the public against the improper use of private property to the injury of the public interest." *Gorieb* v. *Fox*, 145 Va. 554, 560, 561, 134 S. E. 914; Affirmed 274 U. S. 603, 47 S. Ct. 675, 71 L. Ed. 1228, 53 A. L. R. 1210; *West Bros. Brick Co.* v. *City of Alexandria*, 169 Va. 271, 192 S. E. 881; appeal dismissed, 302 U. S. 658, 58 S. Ct. 369, 82 L. Ed. 508; *Lawton* v. *Steele*, 152 U. S. 133, 14 S. Ct. 499, 38 L. Ed. 385.

Many courts have held that irrigation districts organized for the purpose of irrigation by the united efforts of landowners where established as governmental agencies and under governmental authority come within the police power of the State. The organization and government of such irrigation districts and the statutes regulating the mode of assessments upon the lands therein are held to have been enacted for the public welfare and are sustained as constitutional by both State and Federal courts. *Tulare Irrig. Dist.* v. *Shepard*, 185 U. S. 1, 46 L. Ed., 773, 22 S. Ct. 531; *Fallbrook Irrig. Dist.* v. *Bradley*, 164 U. S. 112, 41 L. Ed. 369, 17 S. Ct. 56. Acts creating such districts have been upheld as against the con-

tention that they violate the right to due process of law (*Roberts* v. *Richland Irrig. Dist.*, 289 U. S. 71, 77 L. Ed. 1038, 53 S. Ct. 519) or that they permit the taking of property for private use. (*Fallbrook Irrig. Dist.* v. *Bradley*, *supra*; 30 Am. Jur., Irrigation, § 77, p. 653).

Irrigation districts are not classified as health measures but, as above stated, are held to be constitutional on the ground that they are established for the public welfare and thus come within the police power of the State. This being so, it can hardly be contended that an act or resolution enacted or adopted primarily for the preservation of the health of the inhabitants of a community does not come under this power.

"It is, of course, settled that the protection of the public health is a valid object for the exercise of the police power. A pure water supply is so intimately connected with the health of the community that the provisions with regard to it are properly a part of the police power of the State * * *." 56 Am. Jur., Waterworks, § 76, page 981.

"So far as concerns the subject matter, it may be stated as a general proposition that all rules and regulations reasonably calculated to preserve health are valid and may be established by health authorities. * * * In addition to regulations for the protection of waters from pollution, the conservation of streams and water supply is a proper subject for the exercise of the police power for the preservation of the public health. Thus, while * * * taking water for domestic or agricultural purposes * * * and the cutting and taking of ice are lawful * * * on such waters to which a party lawfully has access, all of these avocations and pursuits may be restricted or prohibited when the public health demands a restriction or prohibition. (*State* v. *Morse*, 84 Vt. 387, 80 A. 189, 34 L. R. A. (N. S.) 190, Ann. Cas. 1913B 218. See also Anno. 41 L. R. A. 117) * * * A statute empowering a State board of health to prohibit the use of water or ice from any given source where, in the opinion of the board, the use thereof endangers the public health is valid, and does not offend against the constitutional provision respecting personal lib-

erty. (See Anno. 23 L. R. A. (N. S.) 766; 18 Ann. Cas. 496)." 25 Am. Jur., Health, § 24, pp. 302, 303.

■ Craft also contends that § 6(13) of the act is unconstitutional because the enforcement of the provisions thereof and the provisions of the resolution of June 16, 1950, constitute a special assessment on abutting property owners in violation of section 170 of the Constitution of Virginia. There is no merit in this contention. This section of the Constitution, among other things, prohibits a city, town or county from imposing taxes or assessments upon abutting property owners for local improvements. No such tax or assessment is here involved. Section 6(9) and section 7(a) of the act provide that the Commission shall have power to establish, impose and enforce the collection of water rates and charges for the use and service of the water system. Such are not "taxes or assessments" as contemplated by the prohibitions of section 170 of the Constitution of Virginia. *City of Roanoke* v. *Fisher*, 193 Va. 651, 655, 70 S. E. (2d) 274, 277; *Hampton Roads Sanitation Dist. Comm.* v. *Smith*, 193 Va. 371, 378, 68 S. E. (2d) 497, 501; 43 Am. Jur., Public Utilities and Services, § 82, page 624.

■ Neither is there merit in Craft's remaining contention that the resolution of June 16, 1950, requiring him as an abutting property owner to connect to the water system for domestic uses and personal consumption, and to abandon the use of private subsurface water for such uses is invalid because he was not given notice of a hearing on the adoption of the ordinance with the right of appeal therefrom. We hold, under the authorities cited, and in sound reasoning, that no such requirement is demanded. It was held in *Hutchinson* v. *City of Valdosta*, 227 U. S. 303, 57 L. ed. 520, 33 S. Ct. 290, that an ordinance requiring owners of property abutting upon any street along which sewer mains had been laid to install water closets in their houses, and to connect the same with the main sewer pipe, was a valid exercise of the police power and did not deny either due process of law or the equal protection of the laws, although affording no notice

or opportunity to be heard. The same rule used in the *Valdosta* case can appropriately be applied here. Both cases deal with vital health measures. *Farquhar* v. *Board of Supervisors*, 196 Va. 54, 70, 71, 82 S. E. (2d) 577, 587, and authorities there cited.

The exercise of the police power cannot be circumscribed within narrow limits nor can it be confined to precedents resting upon conditions of the past. As civilization changes and advancements are made the police power must of necessity develop and expand to meet such conditions.

For the reasons stated we are of opinion that § 6(13) of Chapter 523 of the Acts of the General Assembly of Virginia of 1948, and the resolution adopted by the Commission on June 16, 1950, requiring "the abutting property owners * * * to connect with said waterworks for domestic uses and personal consumption of water * * * and to abandon the use and consumption of any private subsurface water for such use and consumption", are constitutional, and the decree of the lower court is reversed and the case remanded for the entry of a proper decree not inconsistent with the views here expressed.

*Reversed and remanded.*