Richmond

## B. F. McMahon, et al.

### v.

## City of Virginia Beach

June 6, 1980.

Record No. 781028.

Present: All the Justices.

*Paul M. Lipkin (Edward R. Baird, Jr.; Goldblatt, Lipkin, Cohen, Anderson & Jenkins,* on brief), for appellants.

*Richard H. Matthews, Assistant City Attorney (J. Dale Bimson, City Attorney; Arthur Bergman, Assistant City Attorney,* on brief), for appellee.

COCHRAN, J., delivered the opinion of the Court.

This appeal presents the question whether a city may by ordinance require landowners who possess adequate supplies of potable water provided by their privately owned wells to connect with the municipal water supply system when the ordinance does not require use of the city water.

In the trial court, the Committee to Save Our Wells, an unincorporated association, and more than 200 individual landowners,[1] including B. F. McMahon, filed a bill of complaint for declaratory judgment and injunctive relief against the City of Virginia Beach (the City). Plaintiffs sought an adjudication that the mandatory water connection ordinance adopted in 1977 by the City Council

---

[1] In view of the large number of applicants, as a matter of convenience only the name of B. F. McMahon is individually listed herein.

was unconstitutional and an injunction to prohibit the City and its agents from requiring plaintiffs to comply with the ordinance.

The parties agreed to a comprehensive stipulation of facts. An *ore tenus* hearing was also conducted and on April 28, 1978, the trial court entered a final decree dismissing the Committee to Save Our Wells as a party, and upholding the constitutionality and validity of the ordinance. The individual landowners have appealed, assigning error to the trial court's failure to rule that the City exceeded its power in adopting the ordinance requiring them to connect with the City's water system and to pay various water connection charges.

Prior to adoption of the ordinance the landowners, who reside in the various residential areas of the City, had at their own expense installed wells varying in depth from 50 to 165 feet, sufficiently deep to avoid contamination from septic tanks. Tests of some of the wells, which the City made at the request of the owners, revealed no bacterial contamination. Although the testing program was not complete, the parties stipulated that the quantity and quality of the landowners' well water was good. It was further stipulated that each landowner had invested several hundred dollars in wells and related equipment, and that some of the landowners, before making such investment, had been informed by City personnel that the City did not require "hookups to City water nor did the City contemplate mandatory hookups".

The City has been concerned for many years with the problem of providing an adequate water supply for its residents. Under a contract expiring in 1993, the City purchases its water at a bulk rate from surplus supplies of the City of Norfolk. Numerous studies made by consultants, the United States Army Corps of Engineers, and others, have addressed the water problem. In the summer of 1977, a serious drought in Tidewater Virginia caused the City and the City of Norfolk to impose mandatory water conservation measures. Nevertheless, there was evidence that the City of Norfolk had recently increased its own water resources and expanded its treatment facilities sufficiently to assure an abundant supply of water for both municipalities until the end of the contract period. The City, however, had employed engineers to study and recommend alternative sources of water to supplement the supply available under the contract. These alternatives included potable water that might be withdrawn from shallow wells, such as those of the landowners, and brackish water that might be withdrawn from deep wells and made potable by treatment in a proposed desalinization plant. Moreover,

the City had found that its water distribution system was deficient, and presented potentially serious health problems, especially at the waterfront.

A capital improvement program was proposed to finance water and sewer lines. The City's financial consultants, in recommending that the City issue $20,000,000 in general obligation bonds, did not suggest a mandatory connection ordinance. Upon recommendation of the City Manager, however, approved by the financial consultants in a supplemental report, City Council in March, 1977, adopted a mandatory connection ordinance, providing in pertinent part as follows:

Sec. 37-28. **Connection required.**

The owner of any dwelling or other building in which human beings live or congregate shall, whenever a public water line hereafter is made available by the city, connect such building or dwelling with such water line within one year after such line becomes available.

The parties stipulated that the word "connection", as administratively construed by the City, means bringing the water service line to the dwelling. The line does not have to be brought into the dwelling but "should be readily accessible if and when the supply is needed". It was further stipulated that the ordinance prohibited "the cross-connection between City and well water".

Section 37-29 of the City Code prescribed the applicable connection and installation fees, requiring a minimum fee of $220. This section also provided for payment of a fee for installation of a water-line in the street, the fee for the first 100 feet of frontage of a single-family residence lot being $500, plus $5 for each foot in excess of 100 feet. Thus, the minimum fees would be $220 and $500, respectively, or a total of $720.

The City estimated that the ordinance would require that approximately 4,500 dwellings be connected to the municipal water system, resulting in collection of fees aggregating $3,465,000 "plus or minus $1,000,000". Clearly, the average fee, based upon an estimated total of $3,465,000, would be $770, or slightly in excess of the minimum. There was evidence that the average frontage of the landowners' lots exceeded 100 feet, and it was stipulated that the installation of the average eight-inch waterline in front of a dwelling cost $22 per linear foot. Thus the average cost of installing a waterline in the street abutting a landowner's property would be $2,200.

Included in the stipulation was the following:

### K. Well water—

(1) Subsurface wells could at any time become polluted without prior knowledge of the City or the plaintiffs. The Norfolk Water System is routinely monitored for water quality under the National Safe Drinking Water Act.

(2) A prolonged water table decline could make plaintiffs' wells inoperable.

(3) A prolonged lack of electricity would render plaintiffs' wells useless.

(4) A significant drawdown of ground water might create a salt water intrusion in the plaintiffs' wells.

The likelihood of the foregoing to occur is small.

In its final decree the trial court ruled that Code § 15.1-875[2] authorized a city, under the police powers set forth in Code § 15.1-873,[3] to require connection of premises with a municipal water system. The constitutionality of such a requirement, as the court noted, was upheld in *Sanitation Commission* v. *Craft,* 196 Va. 1140, 87 S.E.2d 153 (1955). In that case, pursuant to enabling legislation, a resolution required abutting property owners to connect with the public water system and to abandon the use of any privately owned well water. We held, relying upon *Hutchinson* v. *City of Valdosta,* 227 U.S. 303 (1913), that the resolution was a valid exercise of police power as a public health measure, and did not constitute a taking of property without due process of law.

The landowners conceded that the City under certain circumstances may require the use of public water if necessary to protect the health of its inhabitants. But they contend that the City cannot

---

[2] § 15.1-875. **Water supplies and facilities.**—A municipal corporation may provide and operate within or without the municipal corporation water supplies and water production, preparation, distribution and transmission systems, facilities and appurtenances for the purpose of furnishing water for the use of the inhabitants of the municipality; may contract with others for such purposes and services; may require the connection of premises with facilities provided for furnishing water; may charge and collect compensation for water thus furnished; and may provide penalties for the unauthorized use thereof.

[3] § 15.1-873. **Purposes for which powers conferred.**—A municipal corporation, in order to secure, preserve and promote health, safety, welfare, comfort, convenience, trade, commerce and industry in the municipality, and among the inhabitants thereof, may exercise the powers and provide and operate the facilities and establishments set forth in this article.

successfully argue that the ordinance, which requires them to connect with the water system but does not require them to use the water, is a valid health measure rather than an impermissible revenue-producing device. They distinguish *Craft* on this ground and additionally submit that in *Craft* there was evidence, not present in this case, that the private wells were located on lots where septic tanks, cesspools and outdoor toilets were maintained, and that some of the well water had occasionally been contaminated.

Although the landowners raised the due process question, they wisely chose not to pursue it. *Craft* resolved the due process issue in the context of a mandatory termination of use of private wells; the present case involves no such mandatory termination.

The landowners argue that even if the City can assess them with the cost of installing the waterlines in the streets abutting their properties it cannot charge connection fees until they elect to connect and use the City water. Contending that no reasonable relationship obtains between the connection fees and the police power of the City, the landowners assert that the charges, imposed upon them for a service that they neither need nor want, constitute invalid special assessments.

■ We consider first the question whether the ordinance is a legitimate health measure. The trial court found that there was no evidence that the City in the exercise of its statutory authority had acted arbitrarily, unreasonably or capriciously, and accordingly affirmed the validity of the ordinance. We agree. A local governing body must necessarily enjoy broad discretionary powers to protect the public health and general welfare of its residents. To anticipate seemingly unlikely events, such as those included in Stipulation K, as public health hazards may be to exercise commendable prudence and foresight. There is no requirement that protective measures be limited to actions taken after a crisis has arisen or a catastrophic disaster has struck. Although Code § 15.1-873 designates other purposes which may justify the enactment of a mandatory connection ordinance pursuant to Code § 15.1-875, we find the public health purpose alone sufficient to support the conclusion that the present ordinance constitutes a valid exercise of the City's police power.

■ Moreover, the trial court found that because the charges imposed by the ordinance would not exceed the actual cost to the City of installing the waterlines in the streets in front of the landowners' residences, a reasonable correlation arose between the benefit conferred and the cost exacted. This finding, which negates the land-

owners' contention that the ordinance was adopted solely as a revenue measure, is amply supported by the evidence. Accordingly, we hold that the ordinance is valid.

■ Inasmuch as the ordinance does not apply to vacant lots, we conclude that the trial court correctly ruled that the charges imposed by § 37-29 of the City Code are fees rather than special assessments. This ruling is consistent with our holding in *Craft,* where we rejected the argument that the mandatory connection resolution constituted a special assessment on abutting property owners that would have violated Section 170 of the 1902 Constitution of Virginia then in effect. The constitutional limitation on special assessments has been removed by Article X Section 3 of the 1971 Constitution, and Code § 15.1-239 now expressly permits special assessments for waterlines provided the assessments shall not exceed the peculiar benefits to the properties. The trial court found that either as fees or as special assessments the charges reasonably corresponded to the peculiar benefits conferred, and this finding is supported by the evidence.

We find no merit in the landowners' argument, unsupported by any case authority, that the City is estopped from enforcing the ordinance as to them. *See Segaloff* v. *Newport News,* 209 Va. 259, 261, 163 S.E.2d 135, 137 (1968).

For the reasons assigned, we will affirm the decree of the trial court.

*Affirmed.*