TIDEWATER ASSOCIATION OF HOMEBUILDERS, INC., ET AL.

V.

CITY OF VIRGINIA BEACH

Record No. 900451

January 11, 1991

Present: All the Justices

*Thomas Scott Carnes (Richard D. Guy; Cromwell, Sykes & Carnes; Shuttleworth, Ruloff, Giordano & Kahle, on briefs), for appellants.*

*Gregory N. Stillman (Kevin J. Cosgrove; D. Arthur Kelsey; Leslie L. Lilley, City Attorney; Hunton & Williams, on brief), for appellee.*

JUSTICE LACY delivered the opinion of the Court.

In this case we consider the legality of a Water Resource Recovery Fee imposed by the City of Virginia Beach to finance, in part, the acquisition of water from Lake Gaston for use by residents of Virginia Beach.

Since 1924, the City of Virginia Beach (the City) has purchased treated water from the City of Norfolk.[1] In 1973, Virginia Beach contracted with Norfolk to purchase the pipes comprising the water distribution system within the corporate limits of Virginia Beach. A second contract expiring in 1993 allows Virginia Beach to purchase Norfolk's "surplus" water supply.

Faced with a substantial growth in population and the expiration of its water supply contract, Virginia Beach studied various alternatives to insure a stable source of water for the future. In 1982, the City concluded that obtaining water from Lake Gaston was the best method to meet future needs. In 1984, the U.S. Army Corps of Engineers granted the City a permit to withdraw up to 60 million gallons per day from Lake Gaston.

The City planned to finance the cost of the project, estimated at $200,000,000, by increasing water rates, issuing general obligation revenue bonds, and adopting a Water Resource Recovery Fee. It is this latter fee which is at issue here.

The Water Resource Recovery Fee was imposed by ordinance adopted on January 6, 1986, by the City Council of Virginia Beach. The ordinance set out the purpose, policy and collection

---

[1] In 1963 the County of Princess Anne and the Town of Virginia Beach were consolidated, creating the City of Virginia Beach.

mechanism for the fee. The fee is levied on a per drainage fixture unit (DFU) basis. It must be paid on connections to the City water system made after January 6, 1986, and on modifications to existing connections to the system, if the modifications result in an increase in DFUs. The amount of the per unit fee was phased in over three steps, starting at $32 per unit and increasing to $95 per unit, effective January 1, 1987.

Under the ordinance, the revenues collected from the fee were to be placed in a special account and disbursed only to "pay costs of projects designed to develop sources of water supply and distribution facilities for the City, and related existing and future debt service."

In December 1986, the ordinance was amended to reduce the $95 permanent fee per DFU to $75. This change was based on revised figures showing that the City's goal of setting the fee at the "minimum amount necessary to recover the recommended average of $2,383.00 per account" could be met by the lower fee. The amount was again reduced to $66 due to an increase in the average number of DFUs per account and the participation of the City of Chesapeake in the project.

On August 28, 1986, Tidewater Association of Homebuilders, Inc. (TAB), a Virginia non-stock corporation, and its members sought a declaratory judgment that the City had no legal authority to levy and collect the fee, that the fee was an unauthorized tax, and that the timing and amount of the fee were arbitrary and capricious exercises of the City's authority. On March 18, 1988, the trial court heard oral arguments on the legal issues regarding the City's authority to enact the fee. The court conducted an evidentiary hearing in May 1988, on the issues of prematurity of the fee and its calculation methodology.

The trial court issued letter opinions on April 15, 1988, and December 7, 1989, holding that the fee was not an impermissible tax; the City had the requisite authority to levy and collect a fee to recover "capital costs incurred in securing a new water source, the construction of transmission lines with related equipment, and necessary expenses related to the project;" and that the fee was neither premature nor arbitrary in amount or application. The court entered final judgment dismissing TAB's petition on January 12, 1990.

On appeal, TAB asserts that the trial court erred in holding that: (1) the City was legally authorized to impose the fee; (2) the

fee did not constitute a tax levied in violation of Article X, § 1 of the Constitution of Virginia; (3) the fee was not premature; (4) the City was "out of water" on January 6, 1986; and (5) the fee charging varying amounts over time was not arbitrary or capricious.[2]

## LEGAL AUTHORITY

A city, in the exercise of its police power, has the right to undertake projects to promote the health, safety, and welfare of its inhabitants, and the operation of a water system is an integral part of the process of protecting the public health. A city has the right and the duty to protect its water supply and "[i]t is settled policy of the State and of all States to encourage any reasonable exercise of this right and power." *Board of Supervisors of Nansemond County* v. *Norfolk*, 153 Va. 768, 775, 151 S.E. 143, 145 (1930). Additionally, Code §§ 15.1-873 and -875 specifically authorize the City to operate a water system in order to promote the health, safety, and welfare of its inhabitants.

Conceding that the City had the authority to undertake the Lake Gaston project, TAB nevertheless contends that this authority does not extend to the fee imposed by the City as a partial financing mechanism for the project, and therefore, that the ordinance is illegal. TAB argues that because the fee in this case is an "impact fee," it must be specifically authorized by statute. TAB contends that imposition of this type of fee is not an exercise of the police power and is only allowed pursuant to statutory approval, citing Code § 15.1-498.1 *et seq.*, authorizing road impact fees. We disagree.

### 1. Financing Authority

TAB's premise, that the financing mechanism or fee chosen by the City must be authorized separately and apart from authorization of the project itself, is flawed. Whether the primary function is undertaken pursuant to the police power or pursuant to statutory authorization, a municipality is vested with the ability to engage in actions necessary to implement that function. *Newport*

---

[2] TAB also assigned error to the trial court's failure to hold that the fee violated the equal protection and due process clauses of the Virginia and United States Constitutions. However, this issue was not argued on brief or in oral argument and, therefore, will not be considered here. *Whealton & Wisherd* v. *Doughty*, 116 Va. 566, 574, 82 S.E. 94, 97 (1914).

*News Shipbuilding & Drydock Co.* v. *Jones*, 105 Va. 503, 512, 54 S.E. 314, 317 (1906).

■ In order to exercise the duty and authority to provide a water system then, the corresponding ability to pay for the system must exist. We agree with the trial court that the ability to finance the cost of providing this service is inherent in the authority to provide it, and the specific mechanism chosen by the City to finance the project need not be defined by statute. Furthermore, it would be unrealistic, inefficient, and unnecessary to require the General Assembly to define every aspect of each mechanism available to a municipality to finance projects such as the Lake Gaston undertaking.

■ While the City has the authority to finance the project, it is not completely free to adopt any mechanism it chooses. Statutory and constitutional directives must be respected. Actions undertaken in the exercise of the police power must be reasonable and cannot unduly restrict citizens' constitutional rights. *Assaid* v. *Roanoke*, 179 Va. 47, 18 S.E.2d 287 (1942). Similarly, where a power is implied from a statutory grant, the reasonable selection rule requires that the exercise of the implied authority be reasonable and consistent with legislative intent. *Commonwealth* v. *County Bd. of Arlington County*, 217 Va. 558, 575-77, 232 S.E.2d 30, 42 (1977).

## 2. Impact Fee

TAB contends, however, that this fee is a specific type of financing mechanism—an impact fee—which requires specific legislative authority. TAB reasons that if the exercise of the police power includes the ability to impose impact fees, there would have been no need for the legislature to enact the road impact fee statutes as provided for by § 15.1-498.1 *et seq.* Assuming that this proposition is correct, TAB's argument that this fee is an impact fee is unpersuasive.

TAB does not provide a definition of impact fee, but the elements of an impact fee are contained in Code § 15.1-498.2 which defines an impact fee as "a charge or assessment imposed against new development in order to generate revenue to fund or recover

the costs of reasonable road improvements necessitated by and attributable to such new development[s]."[3]

Yet throughout its arguments, TAB contends that those paying the fee did *not* generate the need for the facilities. Specifically, TAB posits that, although the fees have been in effect for over four and a half years, "the project for which [the fee payers] have been required to pay a premium has not been provided, and is not even under construction." Thus, TAB argues that the "passage of time between collection of an impact fee and payment of the cost that [the] impact fee is designed to defray" belies the proposition that the need for the facilities to be paid from the fee was generated by those required to pay the impact fee. Under TAB's own theory then, the fee does not meet the definition of "impact fee" as characterized by § 15.1-498.2.

■ We reject TAB's characterization of the fee as an impact fee, not only because of the inconsistencies in TAB's position, *see Ring v. Poelman*, 240 Va. 323, 397 S.E.2d 824 (1990), but also, as discussed below, because it is a proprietary fee and those who are paying the fee are receiving a present, particularized benefit. Having determined that the City was vested with the authority to finance the project, we now consider the remainder of TAB's complaints.

## IMPERMISSIBLE TAX

TAB argues that, even if the City has the authority to impose the fee, the fee is a tax, regardless of the label the City has chosen for it. In TAB's view, the fee is not imposed in conjunction with the regulation of any conduct or use of property, and there is no particularized benefit to those who pay the fee. TAB argues that both the existing water customers, who do not pay the fee, and those added to the system after January 6, 1986, will receive the same benefit from the Lake Gaston project—a stable source of water supply for the future. Therefore, TAB concludes, the primary purpose of the fee is to raise revenue for a public purpose which will benefit all the citizens of Virginia Beach equally, and thus it is a tax. *See Charlottesville v. Marks' Shows, Inc.*, 179 Va. 321, 329, 18 S.E.2d 890, 894 (1942). As all residents of Virginia Beach are not required to pay the fee, it is not a uniform tax

---

[3] TAB apparently accepts this definition, as it relies on the road impact fee statutes as support for its position.

and, for that reason, TAB concludes that it violates Article X, § 1 of the Virginia Constitution.

■ The trial court held that this fee, although it regulates conduct by prohibiting new or expanded connections to the City's water system without payment of the fee, is a proprietary fee—a fee for utility service. We have previously considered and rejected challenges that similar utility fees were, in reality, impermissible tax assessments. *McMahon* v. *City of Virginia Beach*, 221 Va. 102, 107-08, 267 S.E.2d 130, 134 (1980); *Weber Sanitation Comm'n* v. *Craft*, 196 Va. 1140, 1151, 87 S.E.2d 153, 160 (1955). In *McMahon*, we held that where the fee did not exceed the City's actual cost in providing the service, where there was a reasonable correlation between the benefits of the service provided and burdens of the fee paid, and where the fee did not apply to vacant property, the fee was valid and not solely a revenue measure or special assessment. 221 Va. at 107-08, 267 S.E.2d at 134.

Applying these same considerations to the fee at issue leads to a similar conclusion. The anticipated total revenue which will be generated by this fee represents only approximately one-third of the total costs of the project. Obviously, fee revenues will not exceed the City's cost in providing the service.

While the completion of the project undoubtedly will benefit all water users in Virginia Beach, the City's witnesses testified that without the prospect of the Lake Gaston project, new developments or connections to the existing water system would not have been possible. Therefore, those who are paying the fee for the new connections, or expanded unit service, are receiving an immediate benefit—access to the present City water system which would be unavailable without the project. Furthermore, the City has demonstrated that the project's scope is considerably larger and, therefore, more expensive than would have been required in the absence of new connections.

■ Finally, the provisions of Article X, § 1 apply to taxation of property. This fee is not assessed against property, since only those connecting to the City water system pay the fee; vacant lot owners do not. Therefore, the fee is not a tax and is not prohibited by Article X, § 1 of the Virginia Constitution.

## VALIDITY OF THE ORDINANCE

TAB's remaining contentions, concerning the "prematurity" of the fee, the trial court's finding that the City was "out of water"

on January 6, 1986, and the changes in the amounts of the fee, are relevant to the question whether the ordinance was a proper exercise of the City's legislative authority.

The standard of review of a challenged city ordinance is well established.

If the presumptive reasonableness of legislative action is challenged by probative evidence of unreasonableness, the challenge must be met by evidence of reasonableness. If such evidence of reasonableness is sufficient to make the issue fairly debatable, the legislative action must be sustained; if not, the evidence of unreasonableness defeats the presumption and the legislative act cannot be sustained.

*Town of Narrows* v. *Clear-View Cable TV*, 227 Va. 272, 280-81, 315 S.E.2d 835, 840, *cert. denied*, 469 U.S. 925 (1984) (citations omitted).

In reviewing this issue we must give full credit to the presumption of validity of the challenged legislation and also accord the trial court's finding a presumption of correctness. *Id.* at 281, 315 S.E.2d at 840. The trial court's finding may be set aside only if, based on the record, it is clearly wrong. Code § 8.01-680; *Bankers Credit Serv. of Vermont* v. *Dorsch*, 231 Va. 273, 343 S.E.2d 339 (1986).

## 1. Prematurity

Although this contention is intertwined with its position that this fee is an "impact fee," a position we rejected above, TAB asserts that the failure to require the revenue from the fee to be spent within a specified period of time or to be refunded renders the ordinance arbitrary. A determination whether such a time limitation is required is unnecessary here. Significant expenditures have been made and will continue to be made in furtherance of the project. For example, the City has already spent over $9,000,000 for engineering, right-of-way acquisition, and site acquisition. It has obligated itself to the expenditure of more than $3,000,000 for future preconstruction costs. The City has also spent over $9,000,000 to expand its current water distribution system in order to accommodate present and future needs.

Not only are significant expenditures being made presently on the project, but new customers are receiving a present benefit

in being able to connect to the system. Thus, there is a present service being received for the fee and ongoing progress is being made toward the completion of the project. Therefore, the enactment of the fee was not premature.

### 2. "Out of Water"

TAB endeavors to bolster its argument that the fee was premature by attacking the trial court's finding that the City was "out of water" in January 1986. TAB asserts that the City was not "out of water" on that date, and, therefore, the City improperly required these litigants, as new customers, to pay a fee grounded on the City's finding that it was "out of water."

In support of its position, TAB points to the fact that new customers continue to be added to the system, that water is still running through the taps in Virginia Beach, and that the first recital in the 1986 ordinance itself stated that the City determined "that current water supplies will be inadequate to meet projected demand after 1990." Furthermore, TAB points out that expansion of the capacity of the water treatment facility, a substantial component of the project costs, will not be needed until 1995. Therefore, TAB urges that the costs associated with furnishing water to new and old customers until 1990, when the City has said it would "run out of water," are identical. TAB submits that the ordinance establishing the fee is "arbitrary and capricious legislation" which "cannot pass muster," because customers connected after January 1986 are required to pay a fee based on a presumption that contradicts the City Council's own predictions of when the City would run out of water.

The record reflects that, for the Norfolk water system, the "safe yield" capacity (the maximum amount of good quality water that can be produced during a critical drought or dry period) is 70 million gallons per day (mgd). The City's exhibits showed that between January 1, 1986, and July 1, 1986, the demand on the Norfolk water system exceeded its safe yield capacity, growing from 69.14 mgd to 71.91 mgd.

The parties presented conflicting testimony concerning the percentage of the level of risk that should be factored into the safe yield determination and on the question whether safe yield meant water distribution capacity or water supply capacity.

Assuming that TAB met its initial burden of establishing that the ordinance was unreasonable because it imposed a fee

designed to meet a water shortage which, by its own estimation, would not exist until a later date, the City's evidence established that the issue is fairly debatable. Furthermore, the trial court's finding that the City was "out of water" on January 6, 1986, that is, current water supplies were inadequate to meet future demand and that the system exceeded its "safe yield" capacity, is supported by the record and is not clearly erroneous.

### 3. Changing Amount of the Fee

Finally, TAB points out that the fee has been set at four different levels and argues that this fact alone demonstrates that the fee is arbitrary and also "makes it clear that considerations of equity and fairness have taken a back seat."

The City explains its initial two-step fee "phase in" as an attempt to mitigate the impact of the fee on builders who had work in progress on the date the fee was adopted, and to provide such builders with the opportunity to factor the fee into their plans. The City argues that these grounds for classification, along with the presumption of reasonableness, provide a rational basis for the phase-in fees. Likewise, the amendments to the permanent fee, ultimately reducing it to $66, were based on changed circumstances which came to the City Council's attention and were set out in the preambles to the amendatory ordinances.

Like the decision to impose the fee, setting the fee amount was a legislative choice made by the City Council. Again, assuming that TAB introduced probative evidence of unreasonableness based on the fee structure, the justification offered by the City was sufficient to make the issue fairly debatable.

### CONCLUSION

Based on the foregoing reasons, we find that, in imposing the Water Resource Recovery Fee, the City selected a reasonable method to implement its duty and authority to provide for a secure water supply and system. The fee did not violate Article X, § 1 of the Virginia Constitution. It was not an arbitrary or capricious exercise of authority, but was a valid legislative act by the Virginia Beach City Council. Therefore, we will affirm the judgment of the trial court.

*Affirmed.*