**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

─────────────

**No. 13-1076**

─────────────

JOHN B. CORR, on behalf of themselves and all others
similarly situated; JOHN W. GRIGSBY, on behalf of themselves
and all others similarly situated,

                 Plaintiffs – Appellants,

       v.

METROPOLITAN WASHINGTON AIRPORTS AUTHORITY,

                 Defendant – Appellee.

------------------------------

BOARD OF SUPERVISORS OF FAIRFAX COUNTY, VIRGINIA; UNITED
STATES OF AMERICA,

                 Amici Supporting Appellee.

─────────────

Appeal from the United States District Court for the Eastern
District of Virginia, at Alexandria.   Anthony J. Trenga,
District Judge. (1:11-cv-00389-AJT-TRJ)

─────────────

Argued: December 11, 2013          Decided: January 21, 2014

─────────────

Before TRAXLER, Chief Judge, and NIEMEYER and DUNCAN, Circuit
Judges.

─────────────

Affirmed by published opinion.  Judge Duncan wrote the opinion,
in which Chief Judge Traxler and Judge Niemeyer joined.

─────────────

**ARGUED:** Robert John Cynkar, CUNEO, GILBERT & LADUCA, LLP, Alexandria, Virginia, for Appellants. Stuart Alan Raphael, HUNTON & WILLIAMS, LLP, McLean, Virginia, for Appellee. Jeffrey A. Clair, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Amicus United States of America. **ON BRIEF:** Patrick M. McSweeney, Powhatan, Virginia; Christopher I. Kachouroff, DOMINION LAW GROUP, Woodbridge, Virginia; Richard B. Rosenthal, LAW OFFICES OF RICHARD B. ROSENTHAL, Miami, Florida, for Appellants. Philip G. Sunderland, Office of General Counsel, METROPOLITAN WASHINGTON AIRPORTS AUTHORITY, Washington, D.C., for Appellee. David P. Bobzien, Gail P. Langham, Ann G. Killalea, James V. McGettrick, OFFICE OF THE COUNTY ATTORNEY, Fairfax, Virginia, for Amicus Board of Supervisors of Fairfax County, Virginia. Kathryn B. Thomson, Acting General Counsel, SIDLEY AUSTIN, LLP, Washington, D.C.; Paul M. Geier, Assistant General Counsel for Litigation, Peter J. Plocki, Deputy Assistant General Counsel for Litigation, Joy K. Park, Office of the General Counsel, UNITED STATES DEPARTMENT OF TRANSPORTATION, Washington, D.C.; Stuart F. Delery, Acting Assistant Attorney General, Mark B. Stern, Michael E. Robinson, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; Neil H. MacBride, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Amicus United States of America.

---

DUNCAN, Circuit Judge:

Appellants John Corr and John Grigsby brought this putative class action attacking the legality of the toll charged by the Metropolitan Washington Airports Authority ("MWAA") for use of the Dulles Toll Road. They contend that this toll is, in reality, an illegal tax. The district court dismissed their complaint on numerous grounds. For the following reasons, we affirm.

I.

A.

In 1950, Congress authorized the construction of the airport now known as Washington Dulles International Airport. The federal government also acquired a right-of-way running from Interstate 495, the Capital Beltway, to Dulles Airport, on which it constructed the Dulles Airport Access Highway. The access highway runs the length of the right-of-way, with no exits and no tolls, exclusively to service traffic to and from the airport. The government reserved a strip of land in the median of the access highway for a possible future public transportation project.

In 1980, the Virginia Department of Transportation requested and received an easement on which to construct a toll road within the right-of-way to serve non-airport traffic

3

traveling between Washington, D.C. and Fairfax County, Virginia. That road, known as the Dulles Toll Road--or, officially, as the Omer L. Hirst-Adelard L. Brault Expressway--opened in 1984 and connects Interstate 495 with Virginia Route 28.

Also in 1984, the United States Secretary of Transportation proposed the formation of a regional airport authority which would take over control of Ronald Reagan Washington and Dulles International Airports from the United States. Virginia and the District of Columbia both adopted legislation to enter into an interstate compact to form this airport authority.[*] Congress passed legislation approving the compact in 1986 and leased the two airports to the newly formed MWAA. See Metropolitan Washington Airports Act of 1986 ("Transfer Act"), Pub. L. No. 99-591, Title. VI, 100 Stat. 3341-376 (1986) (codified as amended at 49 U.S.C. §  49101 et seq.).

The MWAA was, on one hand, formed as an entity independent from Virginia, the District of Columbia, and the United States

---

[*] The constitution provides a process by which states may, with Congress's consent, enter into agreements to coordinate the states' responses to issues of mutual concern, such as the delineation of state borders, see, e.g., Virginia v. Tennessee, 148 U.S. 503 (1893); management of a shared resource, see, e.g., Lake Country Estates, Inc. v. Tahoe Reg'l Planning Agency, 440 U.S. 391 (1979); or creation of a common transportation infrastructure, see, e.g., Hess v. Port Auth. Trans-Hudson Corp., 513 U.S. 30 (1994). See U.S. Const. art. 1, § 10, cl. 3.

4

government.  Id. § 49106(a)(2).  On the other, it was to possess the powers delegated to it by the District of Columbia and Virginia.  Id. § 49106(a)(1)(A).  Congress also explicitly granted MWAA the power to "to levy fees or other charges." Id. § 49106(b)(1)(E).  Nonetheless, though the MWAA assumed control over the two Washington airports, the Dulles Toll Road continued to be operated not by MWAA but by the Virginia Commonwealth Transportation Board ("CTB").

In the ensuing decades, the Virginia General Assembly repeatedly authorized CTB to use toll revenue to fund mass transit projects within the Dulles Corridor.  In 1990, the Virginia General Assembly authorized CTB to use surplus revenue from the Dulles Toll Road to fund improvements, including mass transit projects.  1990 Va. Acts ch. 251 § 13, J.A. 218.  In 1995, the Virginia General Assembly again authorized CTB to use surplus toll road revenue to fund mass transit improvements and to raise another $45 million by issuing new bonds.  1995 Va. Acts ch. 560 § § 2, 14, J.A. 410-13.  In 2002, the General Assembly approved a CTB resolution providing that CTB would spend 85% of its surplus revenue from the Dulles Toll Road to fund "mass transportation initiatives in the Dulles Corridor." H.J. Res. 200 (Va. 2002).  Finally, in 2004, the Virginia General Assembly granted CTB open-ended authority to issue revenue bonds to fund, among other things, a mass-transit rail

5

project in the Dulles Corridor, to be paid with revenues from the Dulles Toll Road. 2004 Va. Acts ch. 807 § 1, J.A. 224-30. CTB then raised the Dulles Toll Road rates, earmarking the additional money raised for extending the Washington Metrorail system through the Dulles Corridor. The Metrorail expansion is planned to extend through the corridor with stops both before and after the Dulles Airport.

## B.

MWAA, meanwhile, shared Virginia's goal of extending the Metrorail system to Dulles Airport. Moreover, under the Transfer Act, MWAA was to "assume responsibility for the Federal Aviation Administration's Master Plans for the Metropolitan Washington Airports." 49 U.S.C. § 49104(a)(6). The FAA master plans called for an expansion of the Metrorail system to Dulles Airport. See FAA Record of Decision, Dulles Corridor Metrorail Project, 4, J.A. 238.

Therefore, to fulfill this mandate, MWAA proposed to take control of the Metrorail expansion project, as well as the Dulles Toll Road which was providing much of the revenue for the expansion. Virginia agreed and control transferred from Virginia to MWAA in December of 2006. The agreement gave MWAA the power to set tolls on the Dulles Toll Road, but required it to use toll-road revenues exclusively for transportation improvements within the Dulles Corridor.

6

This arrangement has now been subject to repeated legal challenges. Almost immediately after the agreement was executed, two toll-road drivers sued in Virginia state court seeking a declaration that MWAA's use of toll-road revenue for the Metrorail project was taxation without representation in violation of the Virginia Constitution. See Va. Const. art. I, § 6. The Virginia court there determined that the tolls were not taxes. Gray v. Va. Sec'y of Transp., No. CL-07-203, Am. Order (Va. Cir. Ct. Oct. 20, 2008), J.A. 258-59.

A second action was brought in 2009, this time in federal court. Among many other counts, the plaintiffs in that suit also contended that MWAA's use of toll revenue to fund the Metrorail project was an illegal tax under the Virginia Constitution. That case, however, was ultimately dismissed for lack of standing. Parkridge 6, LLC v. U.S. Dep't of Transp., 420 F. App'x 265, 267 (4th Cir. 2011).

D.

In April of 2011, appellants initiated this action seeking to enjoin MWAA from using toll-road revenue to repay bonds issued to fund the Metrorail project and seeking refunds of all excess tolls collected. Concluding that plaintiffs' grievance was too generalized to support standing, the district court dismissed the complaint on prudential grounds. Plaintiffs'

7

proper recourse, the court concluded, lay in the political process.

The court also deemed it necessary to reach the merits of plaintiffs' complaint should a reviewing court, on appeal, disagree with its standing analysis. The court concluded, among other things, that plaintiffs had withdrawn their 42 U.S.C. § 1983 claim during oral argument, that the toll charged on the Dulles Toll Road was not a tax under Virginia law, and that Congress's approval of the interstate compact preempted any restrictions that Virginia law might have placed on MWAA's powers.

Appellants initially appealed this decision to the Federal Circuit on the theory that MWAA is a federal instrumentality and that the Federal Circuit therefore had jurisdiction under the Little Tucker Act. See 28 U.S.C. §§ 1295(a)(2) & 1346(a)(2). The Federal Circuit concluded, to the contrary, that MWAA is not a federal instrumentality. Accordingly, it determined that it lacked jurisdiction to hear the appeal and transferred the case to us.

II.

Appellants' argument proceeds from the premise that, under the Virginia Constitution, the state legislature is unable to delegate its taxing authority to an independent body. Under

8

Article I, § 6, of the Virginia Constitution, "taxes must be imposed only by a majority of the elected representatives of a legislative body, with the votes cast by the elected representatives being duly recorded." Marshall v. N. Virginia Transp. Auth., 657 S.E.2d 71, 79 (Va. 2008). Thus, appellants argue, Virginia could not legally have delegated its taxing power to MWAA when Virginia agreed to the interstate compact.

Appellants argue that the toll paid by users of the Dulles Toll Road is in fact a tax. This is so, they contend, because instead of merely defraying the cost of a driver's use of the road, a portion of the toll is used for other purposes, namely the Metrorail expansion project. Therefore, the argument goes, because MWAA lacks the power to tax, the tolls are illegal, and MWAA's exaction and retention of those funds is a violation of due process.

We note at the outset that plaintiffs identify no law that would create a cause of action for this sort of constitutional violation. While it is clear that they allege a violation of the Due Process Clause of the Fourteenth Amendment, their argument is far less illuminating on the question of what law authorizes a suit in federal court to redress it. See Cale v. City of Covington, 586 F.2d 311, 314 (4th Cir. 1978). Rather, "[appellants'] due process argument sounds like a state law claim dressed up in due process clothing. . . . Such suits are

9

rarely favored, for the Fourteenth Amendment is not meant to be 'a font of tort law.'" Mora v. City Of Gaithersburg, 519 F.3d 216, 231 (4th Cir. 2008) (quoting Cnty. of Sacramento v. Lewis, 523 U.S. 833, 848 (1998)). We need not grapple with this complicated constitutional issue, however, because we conclude that appellants' argument suffers from a more fundamental flaw.

A.

Before reaching the substance of appellants' argument, we must also address the question of standing. The district court held that the plaintiffs present a "'generalized grievance' shared in substantially equal measure by all or a large class of citizens" and, accordingly, dismissed the complaint for lack of standing, as a prudential matter. See Bishop v. Bartlett, 575 F.3d 419, 423 (4th Cir. 2009) (internal quotations and citations omitted). We review this determination de novo. S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC, 713 F.3d 175, 181 (4th Cir. 2013). We are compelled to disagree.

The Supreme Court has defined a generally available grievance as one that "claim[s] only harm to [plaintiffs'] and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large."

10

Lance v. Coffman, 549 U.S. 437, 439 (2007) (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 560–561 (1992)).

But appellants' claim here is more concrete. While they may bring with them the baggage of various policy-based objections to the Metrorail expansion project, they also bear the concrete harm of having paid what are, in their view, inflated tolls. They seek tangible and particularized relief: they want their money back. Moreover, they are not so numerous, and their grievance is not so attenuated, that their claim amounts to a generalized, and impermissible, taxpayers' claim. See Bishop, 575 F.3d at 424. We therefore conclude that appellants' claims are barred neither by the standing requirement of Article III of the United States Constitution nor the prudential restrictions we have recognized on our own judicial power. See Frank Krasner Enterprises, Ltd. v. Montgomery Cnty., 401 F.3d 230, 234 (4th Cir. 2005)

B.

We turn, then, to the substance of appellants' argument. Though appellants present their claim as arising under the United States Constitution, their theory is parasitic on state-law arguments. The question before us, ultimately, relates to what fund-raising powers the General Assembly could have delegated to the MWAA under Virginia law. As the numerous Virginia cases cited infra demonstrate, Virginia courts look to

11

a substantial body of Virginia Constitutional law in answering such a question. We will do the same.

Under Virginia law "[a] tax is an enforced contribution imposed by the government for governmental purposes or public needs. It is not founded upon contract or agreement." Westbrook, Inc., v. Town of Falls Church, 39 S.E.2d 277, 280 (Va. 1946). Virginia courts ask whether a given exaction is "a bona fide fee-for-service or an invalid revenue-generating device." Eagle Harbor, L.L.C. v. Isle of Wight Cnty., 628 S.E.2d 298, 304 (Va. 2006) (internal quotation marks omitted). "[T]olls are user fees [and not taxes] when they are 'nothing more than an authorized charge for the use of a special facility.'" Elizabeth River Crossings OpCo, LLC v. Meeks, 749 S.E.2d 176, 183 (Va. 2013) (quoting Hampton Roads Sanitation Dist. Comm. v. Smith, 68 S.E.2d 497, 501 (Va. 1952)).

The "fee-for-service" inquiry does not focus narrowly on whether the fee is calculated to defray just the costs actually incurred by the user. Rather, Virginia law requires only that there be a "reasonable correlation between the benefits of the service provided and burdens of the fee paid." Tidewater Ass'n of Homebuilders, Inc. v. City of Virginia Beach, 400 S.E.2d 523, 527 (Va. 1991). The fee may exceed the immediate cost of providing the service, and the entity that levies the fee may maintain a surplus in anticipation of future expenditures--that

12

is, a fee may permissibly be used to fund future benefits for users of the service as a group.  See Mountain View Ltd. P'ship v. City of Clifton Forge, 504 S.E.2d 371, 375-76 (Va. 1998).

Here, the tolls paid by drivers on the Dulles Toll Road are not taxes for precisely the reasons articulated by the Virginia Supreme Court in Elizabeth River Crossings:

> (1) the toll road users pay the tolls in exchange for a particularized benefit not shared by the general public, (2) drivers are not compelled by government to pay the tolls or accept the benefits of the Project facilities, and (3) the tolls are collected solely to fund the Project, not to raise general revenues.

749 S.E.2d at 183.  We discuss each of these conclusions in turn.

1.

First, it is clear that "toll road users pay the tolls in exchange for a particularized benefit not shared by the general public."  Id.  Users of the Dulles Toll Road will benefit from the Metrorail expansion project whether or not they ultimately choose to ride it.  The record makes clear that the goal of the project is not just to provide access to the Airport, but to relieve traffic congestion throughout the corridor, including on the Dulles Toll Road.  This is evident not only in the findings of the Virginia General Assembly and the Federal Transit Administration, but also as a matter of common sense: the planned expansion adds multiple stops both before and after the

13

airport, on a route that closely follows the Dulles Toll Road for the perfectly evident purpose of serving the commuters who normally travel that route.

Thus, those who pay the toll receive, in exchange, both the immediate benefit of the use of the road as well as the future benefit of being able to choose between travelling by Metrorail or driving on a road with reduced congestion. While there is no guarantee that each driver who pays the toll will be the exclusive beneficiary of those funds, Virginia law does not require such a direct correspondence. It requires only a "reasonable correlation." See Tidewater Ass'n of Homebuilders, 400 S.E.2d. at 527.

2.

Similarly, as in Elizabeth River Crossings, "drivers are not compelled by government to pay the tolls or accept the benefits of the Project facilities." 749 S.E.2d at 183. There are two aspects of this conclusion: the fee is both voluntarily paid and the resulting benefits are voluntarily received. While the latter inquiry is counterintuitive, it serves a useful purpose. Some exactions, such as a sales tax, remain taxes despite being levied upon voluntary behavior. Under the reasoning of Elizabeth River Crossings, what distinguishes these taxes from user fees is that the government services purchased

14

with their proceeds benefit every citizen in the community, whether she has asked for the benefit or not. Id. at 185.

Turning to the first inquiry, it is clear that the toll is voluntarily paid. Nobody is forced to drive on the Dulles Toll Road. Like most toll roads, the Dulles Toll Road merely provides motorists with a faster alternate route to reach their destinations in exchange for a fee. A motorist who objects to the toll may take another route.

The answer to the second question is no less clear. The funds raised for the Metrorail expansion project directly benefit only travelers who use the Dulles Corridor, not the community as a whole. Receipt of the benefit is therefore voluntary in that it only accrues to those who have chosen to travel in the corridor. While this group is not limited only to Dulles Toll Road drivers, this prong of the Elizabeth River Crossings test does not ask whether those who pay the toll are the only ones who benefit. It asks only whether receipt of the benefit is voluntary. There can be little doubt that use of the Dulles transit corridor--whether by using the airport, driving on the access road, or driving on the Dulles Toll Road--is voluntary.

3.

Finally, "the tolls are collected solely to fund the Project." Id. at 183. The Metrorail expansion is part of the

15

same project as the Dulles Toll Road. As we have already noted, the toll road and the Metrorail expansion run through the same narrow transit corridor, serve many of the same areas, and will benefit many of the same commuters. The Virginia General Assembly explicitly found as much when it designated "transportation improvements in the Dulles Corridor," including "the Dulles Toll Road, the Dulles Access Road, . . . [and] mass transit" as components of a single project for the purpose of revenue-bond financing. 2004 Va. Acts ch. 807, J.A. 224.

The Virginia Supreme Court in Elizabeth River Crossings was faced with arguments similar to those before us now: there, as here, appellants argued that, regardless of how the state characterized them, the various particular arteries were not sufficiently intertwined to be considered parts of a single project. But the Virginia Supreme Court showed no appetite for such an inquiry. It took for granted the state's choice to treat the individual tunnels and bridges as components of a common project. It instead inquired into whether the toll revenue would flow outside of the project, so defined, to benefit citizens at large. See Elizabeth River Crossings, 749 S.E.2d at 185.

Following that approach, we accept Virginia's and the MWAA's assessment that the Metrorail expansion and the Dulles Toll Road are parts of a single interdependent transit project--

16

though we observe once more that this notion hardly strains credulity. Because they are parts of the same project, tolls charged on the Dulles Toll Road are not transformed into taxes merely by being used to fund the Metrorail expansion.

The record does not indicate that the surplus tolls are diverted outside those confines or are treated, in any sense, as general revenue. Indeed, the very basis for appellant's complaint is that the increased tolls are earmarked specifically to fund the Metrorail expansion as provided under § 4.01(e) of the operating agreement between Virginia and MWAA. Therefore, we conclude that the tolls collected are used solely to fund the project.

III.

Under the Elizabeth River Crossings framework, therefore, the tolls charged for passage on the Dulles Toll Road are user fees, not taxes, under Virginia law. Their collection by the MWAA thus does not run afoul of the Virginia Constitution and, accordingly, does not violate the due process rights of motorists. The district court's order dismissing the complaint is therefore

AFFIRMED.

17