# CIRCUIT COURT OF LOUDOUN COUNTY

Steve Giordano, Jr., et al.

v.

Town of Leesburg

March 6, 2009

Case No. (Civil) 42736

By Judge Thomas D. Horne

On October 6, 2006, Complainants filed with the Court the instant complaint for declaratory and other relief. They, as out-of-town customers, assert that the Town of Leesburg is providing water and sewer service to them at a rate that is unfair, unreasonable, and inequitable. The rates in question became effective on January 1, 2006, and evoke a 100% surcharge to those of in-town residents.

It is requested that the Court declare the water service rates charged out-of-town customers to be unfair and unlawful under Va. Code Ann. § 15.2-2143; declare the sewer service rates charged out-of-town customers to be impracticable, inequitable, non-uniform, and unlawful under Va. Code Ann. § 15.2-2119; declare that the actions of the Town in enacting the rates without a basis in cost of service provided was irrational, arbitrary, and capricious; award a refund by way of a monetary judgment to the complainants for those payments determined to be excessive; and enjoin the

Town to adjust its rates for water and sewer service provided out-of-town residents to a level that is fair, reasonable, practicable, equitable, and uniform.

The General Assembly has provided that:

> [e]very locality may provide and operate within and without its boundaries water supplies and water production, distribution, and transmission systems, facilities and appurtenances for the purpose of furnishing water for the use of its inhabitants; or may contract with others for such purposes and services. Fees and charges for the services of such systems shall be *fair and reasonable* and payable as directed by the locality.

Va. Code § 15.2-2143.

By agreement with the County of Loudoun, the Town of Leesburg has been granted the exclusive right to provide out-of-town water service to the complainants.

With respect to the availability of sewer service, the General Assembly has allowed for the provision of sewer service by localities, for which service the locality may charge fees that are practicable, equitable, and uniform as to type, class and amount. Va. Code Ann. § 15.2-2119.

Plaintiffs suggest that, in setting the water and sewer rates for out-of-town customers, the Town Council acted as a proprietary public utility. Thus, they argue, judicial review of the reasonableness of the rate surcharge for out-of-town should be determined based upon a lower threshold of proof, that is, a preponderance of the evidence. A municipality, in providing water and sewer service to its customers is said to act in a proprietary capacity. However, the fact that it may do so does not compel a finding that in setting rates for service by ordinance, it does not exercise legislative discretion.

Furthermore, plaintiffs assert that the action of the Town in setting out-of-town rates for water and sewer customers is an invalid revenue-generating device. That is, the benefits received by these plaintiffs bore no reasonable correlation to the burden imposed by the surcharge.

The Court finds that this claim of the plaintiffs must fail. While an argument may be made that the disparate treatment given in-town and out-of-town customers is unreasonable, the evidence is uncontroverted that the funds collected for providing both in-town and out-of-town service are used exclusively to fund water and sewer service. Thus, all such receipts are segregated in a separate enterprise fund to be used to both maintain the system and to pay down on debt connected with improvements to the water and sewer facilities.

Other cases have affirmed the validity of rates charged by municipalities under similar circumstances. In *Mountain View Ltd. Partnership v. City of Clifton Forge*, 256 Va. 304, 312 (1998), the Court stated, "We conclude that the record contains sufficient evidence to support the finding of a reasonable correlation between the benefit conferred and the cost exacted by the 1991 Ordinance."

Similarly, in *McMahon v. City of Virginia Beach*, 221 Va. 102, 107 (1980), it was noted, "[m]oreover, the trial court found that, because the charges imposed by the ordinance would not exceed the actual cost to the City of installing the waterlines in the streets in front of the landowners' residences, a reasonable correlation arose between the benefit conferred and the cost exacted."

Lastly, the Court held in *Tidewater Homebuilders v. City of Va. Beach*, 241 Va. 114, 121 (1991) that, "[t]he anticipated total revenue which will be generated by this fee represents only approximately one-third of the total costs of the project. Obviously, fee revenues will not exceed the City's cost of providing the service."

In *Mountain View Ltd. Partnership*, the Supreme Court of Virginia synthesized these concepts in finding that:

> [A] municipal ordinance setting a fee for refuse collection and disposal is not an invalid revenue-generating device solely because the fee set by the ordinance generates a surplus. The relevant inquiry, as set forth in *McMahon* and reaffirmed in *Tidewater* is whether there is a reasonable correlation between the benefit conferred and the cost exacted by the ordinance.

*Id.* at 312 (authorities omitted).

In the instant case there is a reasonable correlation between the service provided by the Town to water and sewer customers and the cost to customers. The imposition of the surcharge is not a tax to support other projects of the Town masquerading as a fee for service.

The relevant inquiry thus becomes whether the plaintiffs have shown the Town to have acted unreasonably in enacting the surcharge for out-of-town customers and, if so, has the Town put forth sufficient evidence to make the reasonableness or the rate a question that is fairly debatable.

In applying the fairly debatable standard of judicial review to legislative acts, this Court is required to consider the action of the Town in setting the rates for out-of-town customers to be presumptively reasonable. Plaintiffs are

required to produce evidence of the unreasonableness of the action of the Town. Should they do so, then, the Town must meet the challenge of the plaintiffs by providing some evidence of reasonableness.

Lastly, "[i]f evidence of reasonableness is sufficient to make the question fairly debatable, the [legislative action] must be sustained. If not, the evidence of unreasonableness defeats the presumption of reasonableness and the [legislative action] cannot be sustained." *Eagle Harbor v. Isle of Wight County*, 271 Va. 603, 616 (2006) (authorities omitted).

In the instant case, the evidence of the plaintiff is sufficient to support a finding of unreasonableness so as to overcome the presumption of legislative validity. The nature of this evidence will be discussed at greater length below.

The critical issue to the outcome of this case, is whether the Town has put forth sufficient evidence to "level the playing field" by making the out-of-town rates "fairly debatable."

Important to a consideration of the reasonableness of the actions of the legislative body is the weight to be given the opinions of experts who have testified in this case. The testimony of experts in this case, as in all cases, must be based upon the facts and data both in evidence, as well as, material that is typically relied upon in the field in developing those opinions. It is not essential to the review of the actions of the Town that these opinions were not available to the members of the Town Council when it made its decision. This Court must conduct an independent, objective review pertaining to the reasonableness of the surcharge rate. In conducting such an analysis, the Court must apply the stringent test applicable to judicial review of legislative acts. The motives of individual members of the Town Council are not a relevant consideration.

Justice Russell of the Supreme Court of Virginia has observed "[j]udicial review of legislative acts must be approached with particular circumspection because of the principle of separation of powers, embedded in the Constitution. That principle precludes judicial inquiry into the motives of legislative bodies elected by the people." *Ames v. Town of Painter*, 239 Va. 343, 349 (1990).

Classifications within ordinances, such as the differences in rates for sewer and water customers, are " 'permissible if the governmental objective is 'legitimate' and the classifications bear a 'reasonable' or 'substantial' relation thereto". . . and " 'carry with them the same presumptions and burdens as the Ordinance itself' and 'are not in themselves discriminatory'." *Estes Funeral Home v. Adams*, 266 Va. 297, 304 (2003) (authorities omitted).

Rates charged by a municipality are not rendered unreasonable merely by reason of the amount of the rate being twice for out-of-town customers, as those charged in-town customers. Comparison of rates is helpful, but not

determinative of the reasonableness of the charge for service. Thus, application of a *per se* rule based upon the differential charged cannot be the determinate of what is a reasonable legislative act. These principles are embodied in the testimony of plaintiff's expert, who notes that the amount of the charge, while a factor, is not conclusive of a fair, reasonable, and equitable surcharge rate.

Unreasonableness is to be determined "not only [from what] is apparent on the face of the Ordinance but also [from what is] clearly shown by extrinsic evidence." *Estes* at 306.

In deciding whether to uphold the rates, the Court, as previously noted, does not explore the motives of the Town Council in enacting the rates, but the evidence that would lead "objective and reasonable persons" to differing conclusions respecting the rates. *Eagle Harbor v. Isle of Wight County*, 271 Va. 603, 616 (2006) (authorities omitted). However, should plaintiffs introduce sufficient evidence of unreasonableness, then the Town must "put forth some evidence of reasonableness for its decision in order to carry its burden to render the matter fairly debatable." *Norton v. City of Danville*, 268 Va. 402, 410 (2004).

Put another way, the reasonableness of the legislative body's decision must be based on more than their own opinion regarding what they believe to be reasonable.

The outcome of this case is not dependent upon a mere difference of opinion among experts. If this were so, then the Town would undoubtedly prevail under the fairly debatable standard. The Court is entitled upon a consideration of all of the evidence to evaluate the testimony of the experts called to testify and to judge the credibility and weight to be accorded those opinions in this case. For, it is for the finder of fact:

> [t]o determine the weight to be given the testimony of the expert witnesses, whose opinions differed. It was [for the Court] to decide, considering the ability and character of the witnesses, their actions upon the witness stand, the weight and process of the reasoning by which they supported their opinion, their possible bias in favor of the side for which they testified, their relative opportunities for study and observation of the matters about which they testified, and any other matters which serve to illuminate their statements.

*Opanowich v. Commonwealth,* 196 Va. 342, 354-55 (1954) (authorities omitted).

As will be seen later, the Court will focus primarily upon the process of reasoning utilized by the experts in arriving at their conclusions and opinions in this case.

Should the Court determine the enactment of the rate surcharge to be an unreasonable exercise of legislative authority, then the Court must determine whether one or more of the plaintiffs is entitled to a refund for any overpayments for water and sewer service from the effective date of the rates established on January 1, 2006.

As previously noted, plaintiffs seek to have the Court determine that the water and sewer rates charged by the Town violate state law and are unfair, unreasonable, impracticable, and non-uniform. Va. Code Ann. §§ 15.2-2119, 15.2-2143. While no statute would provide for a refund, plaintiffs seek recovery based upon the common law. In defense of such claims, the Town has raised the voluntary payment doctrine.

While no cases in Virginia directly address the issue of whether, absent action by the legislature, petitioners may recover a refund under the instant circumstances, guidance may be found in the principles established in cases in which a tax refund is sought for payments later determined to be illegally assessed and collected. That is, if the payments are voluntarily made, then the person paying the tax may not recover.

This Court has previously noted one commentator's view of the doctrine as follows:

> [t]he voluntary payment doctrine, as applied to taxation, generally provides that a voluntary payment of a tax, even an illegal tax, is not recoverable, in the absence of statutory authority providing for recovery. The policy, based on the sovereign immunity of the taxing authority, is to avoid the financial uncertainty that would be caused by taxpayer demands for refunds following the discovery that the taxing authority collected and spent monies under the illegal tax. Under the doctrine, tax payments are presumed to have been made voluntarily, therefore, it is incumbent upon the taxpayer to establish either that the doctrine should not apply, or his or her payment was made involuntarily.

David J. Marchitelli, *Annotation, Voluntary Payment Doctrine as Bar to Recovery of Payment of Generally Unlawful Tax*, 1 A.L.R. 6th 229 (2008). The doctrine has been applied to fees related to the provision of water and sewer service. *Id.*

The voluntary payment doctrine remains a viable defense to damage claims arising in the Commonwealth from the payment of taxes and fees later determined to be illegal. *Phoebus v. Manhattan Social Club*, 105 Va. 144 (1906); *Charlottesville v. Marks' Shows, Inc.*, 179 Va. 321 (1942); *Crestwood Constr. Co. v. Fairfax County*, 212 Va. 6 (1971). All such payments are presumed to be voluntary "until the contrary is made to appear." *Phoebus*, at 149. Either the payment must be made under protest or otherwise have been paid as a result of mistake, duress, coercion, or compulsion. *See Marchitelli* at § 4. The circumstances under which payment was made are relevant to whether a refund may be recovered on judicial review.

The Supreme Court of Virginia has held that:

> [w]here a party pays an illegal demand with full knowledge of the facts which render such demand illegal, without an immediate and urgent necessity therefore, or unless to release his person or property from detention, or to prevent an immediate seizure of his person or property, such payment must be deemed voluntary, and cannot be recovered back. And the fact that the party at the time of making the payment, files a written protest, does not make the payment involuntary.

*Commonwealth v. Conner*, 162 Va. 406, 411 (1934) (authorities omitted).

Whether a payment was coerced is dependent upon a consideration of the totality of the circumstances under which it was made.

Plaintiffs challenge the fairness and reasonableness of the rates charged out-of-town customers for water and sewer service, not the right of the Town to make such charges in the first instance, or to make a reasonable profit on the sale of such service. Thus, it is a portion of the fees paid that would form the basis of a refund. In the event the Court determines the fees are unfair, unreasonable, unlawful, impracticable, and non-uniform, then the plaintiffs have the burden of overcoming the presumption that such payments were made voluntarily.

An analysis of the claimed refunds would include, among other things: the discrete nature of each claim, notice, sanctions for a failure to pay, forms of protest, and nature of other coercive influences exercised by the Town resulting in more than mere economic inconvenience. Merely voicing

concerns in a private or public forum does not support a claim for payment under protest. More is required to overcome the presumption of voluntariness that attaches to such payments. Otherwise, the mere specter of a refund would have a chilling effect on the way in which local deliberative bodies fund the operations of municipal government.

While the Town, in furnishing water and sewer to out-of-town customers functions in a way similar to a monopolistic private utility, it is not. Thus, any reliance upon authorities that address outcomes based upon a contractual delivery of service are inapposite to the instant situation. The case of *Prince George Sewerage & Water Co. v. Bexley Ltd. Partnership*, 247 Va. 372 (1994), while concerned with a challenge to water and sewer rates charged to its customers, does not apply to the instant case. The fee for utility service in that case was charged by a non-public service corporation and was determined by a complicated contractual formula. No such contract exists in this case.

Lastly, the Court has previously observed that, in the event the fees for water and sewer service charged out-of-town customers are unlawful, then the Court would not determine the sewer and water rates to be charged, but instead, would make a finding as to the lawfulness of the fees charged and leave the matter of the rates to be charged to the discretion of the Town Council with instruction respecting the conclusions reached by the Court as to why such fees are determined to be unlawful.

This Court has no legislative grant to determine the rate to be charged by the Town. Any attempt to do so would be an unfounded expansion on the power of the judiciary.

During the course of the trial, the Court received a number of exhibits and heard the testimony of both lay and expert witnesses. A consideration of that testimony is helpful to a consideration of both the reasonableness of the Town's action in approving the surcharge for out-of-town customers and, should the Court determine the rate to be unreasonable, then, whether a refund to any one or more of the plaintiffs is justified.

### Brian L. Shiflett

Brian L. Shiflett, a plaintiff in the case, testified that, although he is not currently a resident of the Commonwealth of Virginia, he was until September 2008 a resident homeowner in the River Creek subdivision located outside the corporate limits of the Town of Leesburg. He noted that other than water and sewer service, he received no other services from the Town. His payments for the service were timely made, and he has no delinquency in his payment history.

Mr. Shiflett indicated that he was challenging the surcharge for out-of-town customers of water and sewer service because the fees charged were (a) unfair, unreasonable, and inequitable, (b) without evidence to support them, and (c) were deemed excessive based upon a technical study prepared by Mr. Glenn Watkins. Mr. Shiflett voiced his complaints by appearing at a public hearing and speaking with members of the Town Council. He placed no phone calls to the Town prior to the setting of the rates, nor did he encourage a boycott of the Town. Mr. Shiflett described the steps he took as what he considered "the most prudent to protest the rate."

He prepared a redacted DVD of various Town Council meetings at which the rates were discussed. This expurgated version, as well as the videos furnished by the Town and from which the shorter version was prepared, were tendered to the Court as exhibits. The Court reserved receiving them in evidence until further argument by counsel. Mr. Shiflett indicated that he was able to determine what was a fair and reasonable rate in November 2008, when he received the report of Mr. Watkins as to what would be a reasonable rate.

At all times when he paid his water and sewer bill, he felt compelled to do so based upon (a) his knowledge that should he fail to do so a lien for service could be placed on his property and (b) his concern that, should he not pay, his water and sewer service would be cut off. Since January 2006, he has paid $4,026.00 in water and sewer fees. He is seeking a refund of those sums paid that are in excess of what is deemed to be a fair and reasonable rate.

*Steve Giordano, Jr.*

Steve Giordano, Jr., a plaintiff and resident of the Lakes at Red Rock community testified that he had paid $6,700.00 for water and sewer service since January 1, 2006. The Lakes at Red Rock community is located outside the town limits of Town of Leesburg. As is the case with the other plaintiffs, by reason of a 1986 Agreement with the County of Loudoun, the Town of Leesburg is the exclusive provider of water and sewer service for Mr. Giordano's property.

Mr. Giordano testified that he believes the surcharge for out-of-town residents is not fair and is unreasonable. He is current in his payments for water and sewer service. He feels compelled to pay for such service based upon his concern that, should he fail to do so, his water will be cut off to his residence. He seeks a partial refund for sums paid in excess of what is determined to be fair and reasonable. While the bill for water and sewer service is in his wife's name, it is paid from their joint account.

Mr. Giordano did not attend any meetings prior to or after the enactment of the rates in protest, nor voice his objections in writing or in person to members of the Town Council. He did not participate in a boycott of the Town in protest to the rates. Mr. Giordano seeks a refund.

### Raymond Baldwin

Mr. Baldwin is the treasurer of the Lakes at Red Rock Homeowner's Association, Inc. The Homeowners Association is a party plaintiff in the case. He indicated that the Association is a customer of the Town of Leesburg's water and sewer service. Town water and sewer are used by the Association in connection with such things as irrigation, pool services, and operation of a clubhouse. He testified that the Association has paid in excess of $54,000 to the Town for water and sewer service since January 2006.

Although the Association complained of the out-of-town rate by talking with others and making appearances before the Town, they did not stop paying their water and sewer bills out of concern for losing service. Although the Association appeared, through its membership at several meetings, they only spoke in opposition at one such meeting. The community manager called the Town to complain, but no e-mails were sent protesting the rate. There was no participation in a boycott of the Town by the Association. The Association seeks a refund.

### Dorothy B. Shearer

Dorothy Shearer and her husband, David, are plaintiffs in this case. Mr. and Mrs. Shearer are residents of the Potomac Station community located outside the Town limits of the Town of Leesburg. The Potomac Station community is provided water and sewer service exclusively by the Town of Leesburg as a result of the 1986 Agreement with the County of Loudoun. Mr. and Ms. Shearer feel that they have no choice but to pay the out-of-town rates that they feel are unfair and unreasonable. Otherwise, they believe their service will be cut off for non-payment. She and her husband seek a refund.

### David Wood

David Wood is a plaintiff in this case and a resident of the community known as Lansdowne on the Potomac. Lansdowne on the Potomac is located outside the corporate limits of the Town of Leesburg and receives water and sewer service exclusively from the Town of Leesburg. He has testified that he believes the out-of-town surcharge is unfair, unreasonable and inequitable.

While he has paid his water and sewer bills in a timely fashion, he has felt compelled to do so based upon the fact that his water service may be turned off should he not do so.

Mr. Wood did not attend any Town meetings concerning the rate surcharge for out-of-town residents or send e-mails to members of the Town in protest. In determining a fair and reasonable rate, he relies upon the expert opinion as to what is a fair and reasonable rate. He seeks a refund.

## Mark Smith

Mark Smith is a resident of the community known as Spring Lakes and a plaintiff in this suit. Spring Lakes is located outside the town limits of the Town of Leesburg but receives water and sewer service exclusively from the Town of Leesburg.

Mr. Smith attended one meeting of the Town Council concerning the rate surcharge, but has not picketed the Town. He has felt compelled to remain current in his payments predicated upon his understanding that his water service would be turned off should he fail to pay. He agrees with the opinion of plaintiff's expert concerning what is a fair and reasonable rate for out-of-town service. He seeks a refund.

## Dennis Lormel

Dennis Lormel, a plaintiff in this suit and a resident of the Lansdowne on the Potomac community, believes the Town of Leesburg acted arbitrarily in setting the surcharge for out-of-town customers of water and sewer service. He asserts the rates are unreasonable but has remained current in his payments because he fears his water service will be cut-off should he fail to do so.

Mr. Lormel placed no phone calls in protest to the rate increase and did not attend any Town Council Meetings where the matter was discussed. He expressed faith in the consultant retained by plaintiffs to determine the reasonableness of the water and sewer rates charged out-of-town customers by the Town of Leesburg.

## David D'Onofrio

Mr. D'Onofrio is a member, current vice president, and former president of the plaintiff's Spring Lakes Homeowners Community Association. As previously noted, this community lying outside the town

limits and consisting of 388 homes is served exclusively by water and sewer service provided by the Town of Leesburg.

Prior to January 1, 2006, Mr. D'Onofrio, in his official capacity and in opposition to the proposed surcharge for out-of-town residents, attended meetings of the Town Council, met with other affected communities, and wrote letters in protest. While the Association is current in its payments for water and sewer service, the membership has felt obliged to do so to avoid having water service turned off. Mr. D'Onofrio noted that the Association was obliged to use Town water for use in its community pool.

The Spring Lakes Homeowners Association is seeking a refund in the case.

### Stewart Curley

Mr. Curley is the president of the River Creek Owners Association, a corporation consisting of the owners of approximately 1,025 homes in the River Creek community. The River Creek Community is located outside the corporate limits of the Town of Leesburg. The Town is the exclusive provider of potable water and sewer service to facilities operated by the Association. There are two facilities operated by the Association and ten staff members that depend on this water and sewer service provided by the Town of Leesburg.

While the Association is current in its payments for water and sewer service, it expressed its opposition to the surcharge for out-of-town residents, including among other things, a meeting with the vice-mayor and a member of the Board of Supervisors. The Association paid the fees for service based upon the understanding of its members that a failure to do so would result in a termination of service.

### Randolph Shoemaker

Randolph Shoemaker, an employee of the Town of Leesburg for thirty-three years, currently serves as the Director of the Department of Utilities. Although lacking expertise in the setting of water and sewer rates, Mr. Shoemaker demonstrated a thorough knowledge of the creation, expansion, and maintenance of all aspects of the current water and wastewater systems operated by the Town of Leesburg. His testimony offered both a historical and operational overview of the systems serving both in-town and out-of-town customers.

The testimony of Mr. Shoemaker provided a clear window into the history and operation of the system and of the rate structure for water and sewer service.

As previously noted, as a result of the agreement reached between the Town of Leesburg and the County of Loudoun in May of 1986, the Town of Leesburg acquired the exclusive right to provide water and sewer service to the areas now inhabited by plaintiffs.

Until January 1998, water and sewer service rates for out-of-town and in-town residents remained the same. At that time, the Town of Leesburg established a phased-in 50% surcharge for water and sewer service provided to out-of-town customers. These rates remained in effect until January 2006, when the Town enacted the 100% surcharge complained of in this case.

Utilizing a diagram of the current water and wastewater systems, Mr. Shoemaker pointed out how in-town and out-of-town customers are served by the systems. He noted that the only difference in service provided in-town and out-of-town customers is the rate charged and that there is no differential in services or cost of providing services between in-town and out-of-town customers.

Operation of the systems and provisions for service are the same for all customers given the location of the service areas and facilities used in providing those services. He did not know why the council decided to apply the 100% surcharge, although he recognized the right of the Town to do so.

Justice Russell, writing for the Supreme Court of Virginia, in the interlocutory appeal in this case, summarized the background of this case and the interrelationship between the establishment of the surcharge and the issuance of utility bonds by the Town as follows:

> [b]y a series of agreements with Loudoun County during the 1980s and 1990s, the Town was given the exclusive right to provide water and sewer services to out-of-town customers whose properties were located within an area of Loudoun County that includes the lands of the complainants. By an ordinance adopted on December 13, 2005, effective January 1, 2006, the Town Council increased the water and sewer rates by applying a 100% surcharge on the rates charged to out-of-town customers. [An initial 50% surcharge was applied in phases between July 1, 1998, and July 1, 2000. Combined with the additional surcharge effective January 1, 2006, out-of-town customers paid twice as much as in-town customers for water and sewer services beginning on January 1, 2006.] The services

provided to residents and out-of-town customers were the same and the surcharge was not related to any difference in the cost of serving the two classes of customers. . . .

A resolution authorizing the issuance of utility bonds up to $63,000,000 was adopted by the Town on February 14, 2006, providing that the bonds would be "payable from the revenues of the Town's water and wastewater system," which were pledged and made subject to a lien for that purpose. Pursuant to Code § 15.2-2607, a certified copy of the resolution was filed in the Circuit Court of Loudoun County on February 17, 2006. The resolution made no mention of the December 13, 2005, ordinance or the rates the Town would charge its customers for water and sewer services.

*Town of Leesburg v. Giordano*, 276 Va. 318, 321-22 (2008).

The Town elected to omit the rates from the resolution respecting the issuance of the bonds and, in doing so, allowed for flexibility in the future setting of rates.

Mr. Shoemaker indicated that neither the sewer nor water systems were operating at capacity after improvements funded by revenues from the utility bond authorized by the February 14, 2006, resolution of the Town. He noted that there were no practical alternatives available to plaintiffs to obtain water other than from the Town and that he doubted that well and septic systems would be approved for any of the plaintiffs' properties.

The rate charged out-of-town customers and in-town customers remained the same from 1986, when the agreement between the Town and the County was finalized, until 1998. In January 1998, the Town adopted a usage rate differential for those living inside the Town and outside the Town.

For those living inside the Town, the rate was set at $2.67 per 1,000 gallons; while for those living outside the Town the rate was set at $3.07 per 1,000 gallons. Sewer rates charged in-town and out-of-town customers were established based upon whether connections were made to both Town water and sewer, or sewer service only. The usage charges for those connected to both Town water and sewer were established at $3.21 per 1000 gallons for premises inside the Town, and $3.69 per 1000 gallons for those premises outside the Town. Where connection was made only to Town sewer service, the charge for use of the sewer system was set at $59.00 per quarter and $68.00 per quarter for premises outside the Town.

Water and sewer usage rates were to increase for premises outside the Town by an additional 14% on July 1, 1999, and by and additional 14% on

July 1, 2000. As of July 1, 2000, this rate differential would represent an increase of 50% in the usage rates charged out-of-town customers over those charged to those living in-town.

As earlier noted, the Town increased the rate effective January 1, 2006, to the current 100% differential. Mr. Shoemaker indicated, that from January 1, 2006 to the present, there is no difference in service provided out-of-town customers as opposed to those living in-town. The service and operation of the system is the same, and the Town does not attempt to break down "in town" from "out of town" service.

In addition, the Municipal & Financial Services Group Study commissioned by the Town Council — and that was before them at the time of the enactment of the 100% surcharge — did not segregate the costs of providing in-town and out-of-town costs of providing service. The report relied upon "policy guidance" from the Town Council in enacting the rate differential for in-town and out-of-town customers. It was noted in the Study that:

> [h]aving evaluated the current rate design, the financial model was used to develop alternative rate structures. The alternative rate designs were developed using methodologies which allocate costs fairly among various user classifications while meeting the Town's goals and objectives. The rate alternative calculations are shown on Schedule 11 in the Appendix of this report.
>
> Two primary water rate structures were considered, each of which would produce the same amount of revenue for Fiscal Year 2006:
>
> Alternative A-Current Rate Structure with "Across the Board" Rate Increases
>
> Alternative B-Current Rate Structure with modified cost allocations
>
> In addition to the rate alternatives, the possibility of changing the out-of-Town surcharge was also considered in our analysis. The Town Council asked that we consider the effect of increasing the surcharge from 50% to 100% for out-of-Town customers. Each of the alternatives includes a 100% surcharge for out-of-Town customers. Since the revenue shortfall is fairly significant and rate increases would have to be rather large (14% for water and 32% for wastewater) to break even in Fiscal Year 2006, increasing rates over several years was considered in the

analysis. The initial goal was to have the water and sewer fund self-sustaining within a three to five year period, while utilizing some of the current fund balance during this period. This would minimize a one time "rate shock" caused by one large increase yet still have revenues equal expenses by the end of the planning period. . . .

We recommend that the Town increase water rates so that there is an overall 8% increase in revenues in Fiscal Year 2006. . . .

We recommend that the Town increase sewer rates so that there is an overall 10% increase in revenues in Fiscal Year 2006.

As previously noted, the Town increased the usage rates for out-of-town water and sewer service in a way that the amount paid by out-of-town customers was 100% greater than that charged to in-town customers.

Mr. Shoemaker declined to express any opinion as to the rates charged out-of-town customers as he considered this a council decision.

*Charles Yudd*

Charles Yudd, an Assistant County Administrator, identified the Agreement between the Town and County that afforded the Town the exclusive right to provide water and sewer service to properties outside the Town and where plaintiffs reside.

*Norman Butts*

Norman Butts is the Director of Finance for the Town of Leesburg and former Inspector General for Montgomery County, Maryland. He noted that he was present at the Town Council meeting in 2005 when the January 1, 2006, rate increase was considered and voted upon. Mr. Butts noted that no effort was made by the Town to segregate the costs of providing water and sewer to out-of-town customers as opposed to those living in-town.

The Town enjoys a good bond rating. Improvements to the water and sewer systems have been financed in part by "double barrel" bonds. Mr. Butts noted the advantages of such instruments in contrast to revenue bonds and general obligation bonds. Double barrel bonds provide credit enhancement combining the pledge of revenues from the enterprise fund with additional security in the pledge of the full faith and credit of the Town. While there exists a perceived risk to residents of the Town in the event of a default, the record is devoid of evidence of how that risk is quantified.

Mr. Butts readily conceded he is not an economist. While he expressed no expertise in the area of utility rate making, his vast knowledge of the Town was helpful in the preparation of the rate study. He never considered the use of anything other than the cash needs model used by the Town. Acts of terrorism are not covered by the Town's insurance. He was able to identify the owners of the system as the taxpayers of the Town.

## Glenn Watkins

Mr. Watkins is an economist with considerable experience in the methodology used in the setting of public utility rates. He expressed an understanding of how rates are determined and a thorough familiarity with the stringent standard of judicial review to be applied in this case. Mr. Watkins reviewed the study prepared by the Municipal & Financial Services Group, the only professional study concerning rates commissioned by, and available to, the Town at the time the 100% surcharge was adopted.

He observed that this study focused on the revenue requirement, noting that the report supported the surcharge to out-of-town residents as a matter of policy and that no analysis was attempted to further quantify the difference.

The study that Mr. Watkins would perform was based on publicly available information, including audited financial statements. Objection to the use of financial data for a period after the enactment of the rates in question was found to be relevant and admissible in these proceedings. While the use of such data may impact on the requested refund, it does not render Mr. Watkins' opinions unworthy of consideration. Plaintiffs seek continuing relief from the impact of the surcharge.

Mr. Watkins identified the methodology used in making his opinions. He explained his use of historical data relating to revenues, cost allocations, and rate design. As opposed to this "utility rate" method that he utilized, he contrasted the "cash needs" approach utilized in the Municipal & Financial Services Group in their rate study. It was noted that, while rate making is objective in nature, it does require some subjective decision-making in the process.

While there is a differential between in-town and out-of-town customers in the current use surcharge, it is not the percentage of the differential alone that is determinative of the reasonableness of the rate to be charged out-of-town customers. To so determine the rate would be like letting the "tail wag the dog." Thus, the use of the surcharge rates imposed by other localities in Virginia, while useful in an analysis, does not indicate what may be

objectively reasonable for the Town of Leesburg. Other municipalities may impose a surcharge equal to or in excess of the 100% in this case and yet be justified when evaluated using a fairly debatable standard.

As mentioned, prior to establishing the rate surcharge, the Town had commissioned the Municipal & Financial Services Group to independently study the issue of rates. This study did not segregate the costs of providing in-town and out-of-town service.

Mr. Watkins has twenty-eight years in conducting rate studies and has appeared before the State Corporation Commission of Virginia in utility rate matters. In accordance with industry-wide standards for analyzing utility rates, he used objective criteria utilizing the fairly debatable standard applicable to the establishment of utility rates for municipalities in setting limits upon what is a reasonable surcharge for out-of-town customers.

In his opinion, articulated with clarity, the utility rate method based upon historic data is the most accurate indicator of what are the limits of fairness and reasonableness. In establishing the limits of such rates, he considered such issues as cost of capital, availability fee contributions, absence of quality issues, transfers from the utility fund to the general fund, system capacity, depreciation, owner's risk, operations and maintenance costs, fair return on investment, and a reasonable profit. The bond covenants, relevant to the double-barreled bonds issued to support the system, do not establish how the rates are to be set. He did not take issue with the rate design or seasonal surcharge in the charges.

In his opinion, in order to establish usage rates applicable to out-of-town customers that withstood scrutiny under the fairly debatable standard of reasonableness, the water surcharge would need to be reduced by at least 45.51% and the sewer rate surcharge by 36.53%. Above those percentages, Mr. Watkins found that reasonable minds would not differ on the issue of the unreasonableness of the surcharge.

It is significant to note that Mr. Watkins found that it was reasonable for the Town to conduct a rate study every five years to determine the revenue requirements of the system on a "cash need" basis and to determine the increase of rates needed to fund the system. He rendered no opinion with respect to whether the rate charged in-town customers was fair and reasonable, an issue not before the case for review. His greatest criticism of the Town's expert is that he did not look at the revenue generated by, and cost of, the water and sewer systems in determining the "outer limit" by which the reasonableness of the Town's actions can be weighed.

Mr. Watkins testified that municipal rate setting involves both art and science. However, in doing so, he adhered to industry-wide standards for analyzing utility rates.

### David Rose

Mr. Rose is an investment banker who concentrates on matters of municipal finance. He has been a consultant to the Town of Leesburg for fifteen years, is aware of the Town's financial policy, and commented upon the fact that the utility fund is self-supporting. Mr. Rose commented upon the economic strength of the Town, indicating that the Town was operating well below its debt limit.

While demonstrating a thorough knowledge of the Town's finances, Mr. Rose indicated he was not an expert in utility rate making, and that he did not attempt to quantify the risk of the Town arising out of the issuance of the double-barreled bonds.

### Edward J. Donahue

Mr. Donahue is a management consultant and CEO of Municipal & Financial Services Group. He was project manager in connection with the Leesburg rate study and presented the final report on November 7, 2005. Rates were established to ensure that the utility would be self-supporting with rates for sewer and water service identified by consumption, seasonal, and charges for the elderly. In the preparation of the report, he looked at the rates charged by other towns outside the jurisdiction of service. The 100% surcharge for out-of-town water and sewer service was included in the report based upon the direction of the Town Council, as a matter of "policy guidance."

### Myron Olstein

Mr. Olstein is a certified consultant with extensive experience with rate studies and municipal water and wastewater issues. He interviewed a number of persons in preparation for rendering his opinions, as well as the bond documents, and a report of Mr. Watkins. It is his conclusion that the rates charged out-of-town customers are fair, equitable, reasonable, and practicable.

In his opinion, the process leading to enacting the rates was sound and reasonable and that the Town followed the best practices in developing the rates. In this connection, the Town considered issues of revenue, the system,

and related objectives. The Town also retained an excellent rate consultant. Owner's risk, owner's equity, and an economic downturn are properly considered in the rate set by the Town. He observed that there was no risk to out-of-town owners and that he had evaluated issues of risk in connection with studies for utilities as part of bond offerings. In the opinion of Mr. Olstein, there is no requirement in establishing rates where risk to Town residents needs to be quantified.

It was the opinion of Mr. Olstein that this is a well-run utility, a point that is not disputed by any other witness. He believes the use of the cash needs as a basis for establishing rates is reasonable and that the utility method is not a requirement. Additionally, he cited problems with the utility rate method, including the inclusion of availability fees in the rate base used (the surcharge does not apply to availability fees), consideration of variable demand, a failure to properly recognize the utilities as grantees of the bond covenants, governmental grant covenants, differences in water and wastewater services, and a failure to recognize rate differentials elsewhere and to draw comparisons with those rates.

He has faulted Mr. Watkins for not accounting for unforeseeable demand and revenues, the cost of implementing new regulations, the risk of catastrophic failure, and a risk of default. Additionally, he erred by using actual 2007 cost data as opposed to data from prior years, not personally visiting water treatment plants, a limited consideration to out-of-town users' costs rather than system costs, and failure to account for reserves and construction grants.

Mr. Olstein concludes that the Town's rates are competitive with rates charged elsewhere. He would deem an unreasonable surcharge to out-of-town customers in this case to be a rate greater than 500% of that charged in-town customers. Mr. Olstein did not do a rate study, as he was not asked to do one.

*Conclusion*

Considering all of the above, the Court concludes that the Town has not met its burden of providing some basis of reasonableness for the higher rates charged out-of-town customers. However, the plaintiffs are not entitled to a refund.

As previously discussed in detail above, merely filing a written protest to the payment of a fee or tax does not make the payment of the fee or tax involuntary. Indeed, it was only in November of 2008, that the plaintiffs could inform the Town in what way the surcharge was unreasonable by receiving expert guidance in quantifying the degree to which the surcharge was

unreasonable. It is the ability to quantify the reasonableness of the surcharge that serves as the basis of this Court's decision and the granting of declaratory and injunctive relief.

Payment by the individual plaintiffs was made in order to provide water and sewer service to their properties. To the extent, in general, payment for water and sewer charges are a condition precedent to maintaining service, and thus, affects habitability, it is not the requirement of payment but the issue of disparity of treatment between in-town and out-of-town customers that is the object of the instant controversy. The Court finds that, under the facts of this case, payment of the surcharge was neither coerced nor compelled.

Mere written protest concerning such disparity or appearances at council meetings do not serve as a basis to overcome application of the voluntary payment doctrine. Were it otherwise, the mere filing of an objection, without articulating a reason for the objection, would lead to the specter of financial uncertainty on behalf of a municipality furnishing the complained of service. As earlier noted, the voluntary payment policy is applied so as "to avoid the financial uncertainty that would be caused by taxpayer demands for refunds following the discovery that the taxing authority collected and spent monies under the illegal tax." David J. Marchitelli, *Annotation, Voluntary Payment Doctrine as Bar to Recovery of Payment of Generally Unlawful Tax*, 1 A.L.R. 6th 229 (2008).

## Relief Granted

Accordingly, the Court will grant the petition for declaratory and injunctive relief and finds that the plaintiffs have shown that the existing surcharge for water and sewer for out-of-town residents is unfair, unreasonable, and inequitable; and that the surcharge for sewer service for out-of-town residents are impracticable, inequitable, non-uniform, and unlawful; and that the plaintiffs have met their burden of proving the actions of the Town in enacting the rates unreasonable and that the Town has failed to produce evidence to make the issue fairly debatable. Based upon the evidence presented, the Court finds that, in order for the surcharge rate to be objectively reasonable, the water surcharge for out-of-town customers would need to be reduced by 45.51% and the sewer rate charge reduced by 36.53%.

The Court will enjoin enforcement by the Town of any surcharge in excess of that by which the existing rates would need to be reduced, as set forth above. However, the Court will stay enforcement of its order for a period of ninety days from this date so that the Town may consider the surcharge rate and this opinion.